# ELECTION CASES.

Furman Sheppard, District Attorney.

David P. Weaver, City Commissioner.

Albert W. Fletcher, Prothonotary of the Common Pleas.

George Getz, City Controller.

Thomas J. Barger, City Solicitor.

John M. Melloy, Receiver of Taxes.

1. There is no bill of exceptions nor appeal to the decision of a lower court in a contested election, and the Supreme Court has no jurisdiction over the subject.

2. A certiorari brings up the record only.

3. Under a certiorari the merits cannot be reviewed, they belong exclusively to the court below.

4. Under a certiorari to the decision of the court below in a contested election case, the report of examiners, calculations of the court, &c., are excluded in the Supreme Court.

5. An Act of Assembly requires that petitioners contesting an election should make affidavit that the statements were "true." An affidavit that they were "true to the best of their knowledge and belief" is sufficient.

6. The Act of Assembly is remedial, and is to be construed to advance the remedy.

[Election Cases.]

7. The special purpose of the oath is to initiate the remedy and give it the impress of good faith and probable cause.

8. The jurisdiction of the lower court being exclusive and final in an election case, it must decide for itself what form of oath gives it jurisdiction.

9. An affidavit may be taken before the recorder of the city of Philadelphia.

10. The petition of an undue election is simply a complaint to initiate inquiry.

11. A statute required that the " court shall hear and determine such contested election at the next term after the election shall have been held." *Held*, that this was directory merely, the act to be done being judicial.

12. The Quarter Sessions may authorize the testimony in contesting the election of district attorney, to be taken by examiners out of its presence.

13. After an election case had been heard and decree made ousting the incumbent, the court properly allowed the contestants to amend their petition *nunc pro tunc* by adding another specification.

14. The power of amendment is within the discretion of the court and cannot be revised.

15. The refusal to quash a petition in an election case is not a ground of error.

16. In the Supreme Court, the only inquiry is, whether the petition is sufficient in its frame and sets forth a proper ground of complaint.

17. The rule as to pleadings in election cases must not be held so strictly as to protect fraud, nor so loosely as to permit the acts of sworn officers to be inquired into without adequate and well defined cause.

18. A prayer in the petition in an election case was to "strike out" certain returns. This prayer did not vitiate the charge of an undue election and false return.

19. The prayer to strike out is not part of the charge in the complaint.

20. There being other grounds of complaint, the presumption is that the court disregarded the prayer to strike out, if that was illegal.

21. Where there are contradictory averments, the proper practice is to move to strike out the contradictory part.

22. The maxims, *Lex non intendit aliquid impossibile. Lex nil facit frustra; nil jubet frustra. Ut res magis valeat, quam pereat. Omne majus continet in se minus. Omnia præsumuntur legitime facto, donec probetur in contrarium*, applied.

23. Chase *v.* Miller, 5 Wright 412; Mann *v.* Cassidy, 1 Brewster 26, considered.

January 27th, 28th, 29th 1870.    Before Thompson, C. J., Read, Agnew, Sharswood and Williams, JJ.

. Writs of certiorari to the Court of Quarter Sessions and Court of Common Pleas of *Philadelphia:* Nos. 98, 99, 100, 101, 102, 103, to January Term 1870.

In the matter of the contested election of Furman Sheppard, returned as elected District Attorney; Albert W. Fletcher, Prothonotary of the Court of Common Pleas; George Getz, City Controller; John M. Melloy, Receiver of Taxes; David P. Weaver, City Commissioner; and Thomas J. Barger, City Solicitor. The certiorari in Sheppard's case was to the Court of Quarter Sessions; in the other cases to the Court of Common Pleas.

The parties above named were returned as elected at the general election, October 12th 1868, to the offices attached to their

names, and on the 15th of the same month severally received certificates of their election.

On the 23d of October Edward S. Clark and other qualified voters presented a petition to the Court of Quarter Sessions, setting forth that the election officers returned that Sheppard had received 61,165, and Charles Gibbons 59,890 votes; that this was a false return and undue election of Sheppard, and that the petitioners contested his right to the office of district attorney; because Sheppard received not more than 57,500 votes, and Gibbons received at least 59,577 votes. They specified that in the 6th election division of the Third Ward the election officers fraudulently conducted the election in wilful disregard of the requirements of the election laws in the following manner:—

" The election officers in said division falsely and fraudulently permitted persons, not qualified voters of said division, to vote at said election, to the number of 54, whose votes were taken and counted for Sheppard, whose names were not on the list furnished by the city commissioners, without requiring or receiving proof of the qualifications of said voters, and without requiring or receiving proof by a qualified elector of the residence in said division of said voters, and without adding the names of said voters, with the names of the persons making proof, to the list furnished by the commissioners.

" They falsely and fraudulently permitted persons, to the number of 50 and upwards, not qualified, to vote, whose votes were taken and counted for Sheppard, and who voted in the names of those who were upon the list furnished by the commissioners.

" They falsely and fraudulently neglected and refused to mark the letter V opposite the names of all the voters on the list furnished by the commissioners who voted in said division, thereby neglecting to make the record required by law of the names and residences of those who voted.

" They fraudulently refused to receive proofs or inquire into the qualifications of voters whose right to vote was legally challenged.

" They falsely and fraudulently received the votes of non-residents of said election division, not qualified voters therein, at said election.

" That all such acts were done and committed with the intent and purpose of holding an undue election, and with the desire to prevent an honest expression of the popular will at said election, and a true ascertainment of the real votes of the qualified voters residing in said division who voted at said election; and that in pursuance of said conduct on the part of the election officers, and the wicked and evil-disposed persons who aided and abetted them in their nefarious designs, the popular will of the voters in said division was not ascertained, but was defeated; and your peti-

[Election Cases.]

tioners thereby charge that the said election so held in said division was false, fraudulent, undue and void, and the return thereof false, and should be stricken from the general return, and be wholly disregarded.

" That at said election in said division the returns of votes received, taken and counted in the general return for district attorney, was: for Sheppard, 380 votes; for Gibbons, 78 votes."

The petition made similar averments as to 54 other divisions, with the number of votes given for Sheppard and Gibbons respectively, specifying the numbers which were illegal in each. * * *.

The petition concluded :—

" Wherefore your petitioners show that at the said election, and by the means aforesaid, the said Charles Gibbons has been duly elected district attorney for the county of Philadelphia, having received more votes than were given for Furman Sheppard, the return candidate, or for any person for said office, and that therefore the election was undue and the return false, in declaring and returning the said Furman Sheppard as duly elected to the said office.

" Your petitioners therefore pray that your honors will appoint a suitable time for hearing this complaint, and make such order as may be necessary to exhibit the aforesaid undue and false return—that you will order, decree and adjudge the said return of the said Furman Sheppard to the office of district attorney aforesaid to be false, and that the said Charles Gibbons was at said election duly and legally elected to said office," &c.

The affidavit was :—

" Samuel Bell and Alexander J. Harper, two of the above petitioners named in the foregoing petition, being duly sworn according to law, do say that they are qualified electors of the county of Philadelphia, and that the facts stated in the foregoing petition are true to the best of their knowledge and belief."

Taken October 22d 1868, before

                    WILLIAM P. HIBBERD, Alderman.

The petition in one of its specifications set out that there was an error in the general return, which, being corrected, would add 313 to Sheppard's votes.

There were petitions and affidavits in similar terms respectively alleging that Richard Donagan had been elected prothonotary of the Court of Common Pleas ; Alexander McCuen city commissioner ; Samuel P. Hancock city controller ; Thomas J. Worrall city solicitor, and Richard Peltz receiver of taxes.

The affidavits to the petitions relating to the city controller, city solicitor and receiver of taxes, were taken before the recorder of the city.

[Election Cases.]

The case of the district attorney was contested under the Consolidated Act of July 2d 1839, Pamph. L. 554, viz. :—

" Sect. 153. The several Courts of Quarter Sessions shall have jurisdiction to hear and determine all cases in which the election of any county or township officer, by the citizens in the respective county, may be contested.

" Sect. 154. Upon the petition in writing of at least twenty qualified electors of the proper county or township, as the case may be, complaining of an undue election or false return of any such officer, the court shall appoint a suitable time for hearing such complaint, notice of which shall be given to the person, at least ten days before such hearing; provided that no order shall be taken on such petition, unless it be accompanied by the oath or affirmation of at least two of such petitioners, setting forth that the facts therein stated are true to the best of their knowledge and belief.

" Sect. 155. The respective Courts of Quarter Sessions shall have authority to compel the attendance of any officer of such election, and of any other person capable of testifying concerning the same, and also to compel the production of all books, papers, tally lists, tickets and other documents which may be required at such hearing in like manner, and to the same extent as in other cases litigated before such court; and shall have all the powers which are conferred upon committees of the legislature by the several provisions of this act."

The case of the prothonotary was contested under another Act of the 2d July 1839, Pamph. L. 566, viz. :—

" That the returns of the elections under this act shall be subject to the inquiry, determination and judgment of the Court of Common Pleas of the proper county, upon complaint in writing of thirty or more of the qualified electors of the proper county of undue election or return of any such officer, two of whom shall take and subscribe an oath or affirmation that the facts set forth in such complaint are true to the best of their knowledge and belief. And the said court shall, in judging concerning said election, proceed upon the merits thereof, and shall determine finally concerning the same, according to the laws of this Commonwealth. And the prothonotary of the said court shall immediately certify to the governor the decree of the said court on such election, and in whose favor such contested election shall be terminated, and the governor shall then issue the commission to such person in whose favor such contested election is determined. And the said court shall hear and determine such contested election at the next term after the election shall have been held. And such complaint shall not be valid or regarded by the court unless the same shall have been filed in the prothonotary's office within ten days after the election."

The other cases were contested under the 35th section of the Act of 2d February 1854, the act consolidating the city of Philadelphia, Pamph. L. 40, viz. :—

" The returns of all municipal elections in the city of Philadelphia, except of members of the select and common councils, shall be subject to the inquiry and determination of the Court of Common Pleas of the county of Philadelphia, upon complaint of fifteen or more of the qualified voters of the proper ward or division, or in the case of mayor, treasurer, city controller, receiver of taxes, city solicitor, or city commissioner, by at least fifty of the qualified voters of the said city, which complaint shall be filed in the said court within twenty days after such election, and at least two of the complainants shall take and subscribe an oath or affirmation that the facts set forth in such complaint are true; and the said court, in judging of such elections, shall proceed upon the merits thereof, and determine finally concerning the same according to the laws of this Commonwealth, and shall have power, if they believe such complaint to have been made without sufficient cause, to decree that the complainants, or any one or more of them, shall pay all legal costs incurred by such investigation." * *

November 14th. The respondents moved to quash the petitions.

The first six reasons following were assigned by all the respondents :—

1. Because the specifications assume that this court is authorized to deprive the qualified electors in the said divisions, of their right to have their votes counted in the general return, on account of the misconduct of the officers in said divisions, which said misconduct is not alleged to have been procured or promoted by said electors.

2. Because said specifications are vague and indefinite in this —that it cannot be ascertained therefrom what number (if any), of illegal votes were cast in said divisions and for whom.

3. Because said specifications, in alleging illegal votes to have been cast in said division, do not specify in what respect they were illegal, so that the same can be accurately inquired into, but can only be sustained by such evidence as would be equivalent to holding an election by this court.

4. Because said specifications do not set forth the names of the persons by whom said illegal votes were cast, nor the number thereof.

5. Because the jurisdiction of this court, under the act, is confined to an inquiry " upon the merits thereof," and that these specifications do not allege that the returns made by said officers were untrue in point of fact, nor that their alleged misconduct changed the result.

6. Because an inquiry upon the complaint of an undue election and false return must be confined to the ascertainment of the

person who had a majority of the legal votes polled for said office, and that no poll can be excluded from a general return, unless it be alleged that no legal votes were cast thereat, which these specifications do not do.

The following additional reasons were assigned by Getz, Melloy, Weaver and Barger :—

1. That the 14th, 15th, 16th, 18th, 19th, 20th, 21st, 22d and 23d specifications consist of lumping averments, affecting numerous election divisions.

2. That the affidavit accompanying the petition was not made before an officer authorized by law to administer the oath or affirmation therein mentioned.

3. That the said affidavit is fatally defective, because the affiants do not swear or affirm that the facts stated in the complaint are true, as required by law, but only that the facts stated in said petition or complaint are true to the best of their knowledge and belief.

4. That the court cannot take jurisdiction of the complaint, unless the same be presented with an affidavit, as required by law, and duly sworn or affirmed to before a competent officer, and this respondent suggests therefore that the court cannot proceed in the cause.

And the said George Getz further moves the court to strike off the said petition, and assigns the following reasons :—

1. That the affidavit accompanying the said complaint was made before " James Given, recorder of Philadelphia," who was not authorized by law to administer the oath or affirmation to the affiants who subscribed it.

2. The affidavit accompanying said petition is fatally defective, because the affiants do not swear that the facts set forth or stated in said complaint are true, as required by law, but only that the facts stated in said petition are true to the best of their knowledge and belief.

3. That as the court cannot take jurisdiction of the complaint unless presented with such an affidavit as is required by law, duly sworn or affirmed to before a competent officer, this respondent therefore suggests that the court cannot proceed further with the cause.

December 5th.    The motions to quash were overruled, and the respondents ordered to answer.

December 31st.    Answers were filed denying the allegations of the petitioners, and also averring that in several election districts there were mistakes in the returns against the respondents which, being corrected, the number of their actual votes would have been increased.

On the 6th of January 1869 the court appointed examiners, whose return was filed September 4th.

On the 16th of October the court decreed that the contestants were duly elected to the respective offices which they claimed.

On the same day the following petition was presented:—

"The petition of the subscribers, citizens and qualified electors of the city of Philadelphia, humbly showeth:

"That they crave leave to amend their petition, filed October 23d 1868, contesting the election of Furman Sheppard to the office of district attorney, in the following particulars, which they are advised may be considered as important in point of form, to wit, to add to the petition a specification as follows:—

"That in the 16th division of the Twentieth Ward of said city, 274 votes were legally cast for the said Charles Gibbons for the said office of district attorney at said election, and 279 votes were cast for Furman Sheppard for said office of district attorney at said election, and that the election officers falsely and fraudulently miscounted the said votes so cast as aforesaid, and falsely and fraudulently counted and returned that Charles Gibbons had received 260 votes for the office of district attorney, and Furman Sheppard had received 305 votes for the office of district attorney at said election, which false and fraudulent count was taken and carried into the general return for the office of district attorney for the said county of Philadelphia.

"Your petitioners, sincerely desirous that the grounds of their complaint may be fully and thoroughly inquired into, crave leave in the above particulars to amend their said petition."

The decree was:—

"And now, October 16th 1869, the court order, direct and grant leave to the petitioners to amend their petition by adding a specification thereto, complaining of the fraudulent miscount and false return of votes cast in the 16th division of the Twentieth Ward, by means of which said fraudulent miscount and false return Charles Gibbons was defrauded of 40 votes for the office of district attorney, as appears by the evidence taken in the case and reported by the examiners to the court, the said amendment to be filed *nunc pro tunc*, with the same effect as if filed on the 6th day of September, A. D. 1869, and before the argument of counsel in the case."

On the 19th of October, writs of certiorari from the Supreme Court were filed in each case.

The following were the assignments of error:—

First.—Those common to all the cases.

1. The court below erred in not quashing the petition, for the reasons assigned.

2. The court below erred in excluding entire election divisions from the general count.

3. The decree of the court below is erroneous, in that the alle-

gations set forth in the complaint do not support the decree of the court below.

4. The decree of the court below is erroneous, in that as the specifications concluding with prayers to reject entire election divisions from the general count are bad, the general decree upon all the specifications is therefore bad and illegal.

5. The court below erred in decreeing that there should be deducted from the majority of the respondent the votes with which he had been credited in the 16th division of the Twentieth Ward, because there is no averment in the original petition filed, nor in any amendment thereto, appearing of record, that these credits are improper ones.

Second.—Those peculiar to the case of the district attorney were:—

1. The court below erred in admitting the amendment relating to the 16th division of the Twentieth Ward, at the time of delivering their final opinion, and after it was read, and in deciding the case as if the same had been applied for before.

2. The court below erred in referring said petition and answer to examiners.

3. The court below erred in adjudging that Charles Gibbons was elected district attorney at the general election of 1868.

Third.—Those peculiar to the case of the prothonotary of the Common Pleas were:—

1. The court below erred in not dismissing the petition at the expiration of the next term after the election—that is to say, of March Term 1869.

2. The decree of the court below is illegal and bad, because the petition was not heard and determined at the next term after the election was held—that is to say, in March Term 1869.

3. The court below erred in adjudging that Richard Donagan was elected at the general election of 1868.

Fourth.—Those peculiar to the other cases were:—

1. The additional reasons for quashing the petitions filed in these cases.

2. The decree of the court below is erroneous, because the jurisdiction of that court over the present case under the Act of February 2d 1854, conferring it, is special, and does not make the fact of an undue election the subject of inquiry or of determination by that court, but limits its inquiry to the returns.

3. The court below erred in adjudging that the several appellants were elected at the general election of 1868.

*G. W. Biddle, W. L. Hirst* and *H. M. Phillips* (with whom were *J. Gerhart, D. W. Sellers* and *L. C. Cassidy*), for plaintiffs in error.

*W. H. Rawle, W. B. Mann* and *Strong*, for defendants in error.

The opinion of the court was delivered, February 14th 1870, by
AGNEW, J.—These are important cases. They are political
controversies; to be regretted, yet for this reason to be met in a
spirit of candid inquiry. The contest of an election is a remedy
given to the people, by petition for redress, when their suffrages
have been thwarted by fraud or mistake. The constituted tribunal
is the Court of Common Pleas, or the Quarter Sessions, as the
case may be. By the Acts of July 2d 1839, and February 3d
1854, the court is to "proceed upon the *merits* of the complaint,
and determine *finally* concerning the same, according to the laws
of this Commonwealth." No bill of exceptions is given to its
decisions, nor appeal allowed, and its decisions are final. Conse-
quently the Supreme Court has no jurisdiction over the subject.

The attempt to press into service the Act of 1869, as giving an
appeal, lacked the earnestness of conviction, and needs no refuta-
tion. It gives no appeal, while the appeal given on the receiver's
account excludes the presumption that any other appeal was
intended. The finality of the Acts of 1839 and 1854 remains,
and there is no implication of an appeal, for there is no incon-
gruity in this respect. It is only in case of a strong repugnancy
that a former law is repealed by a subsequent act: Street *v.* Com-
monwealth, 6 W. & S. 209; Bank *v.* Commonwealth, 10 Barr
449; Brown *v.* County, 9 Harris 43.

Why, then, have the merits been so strongly urged? Why
have the cases been termed appeals, and the parties appellants and
appellees? Nothing but confusion can flow from these designa-
tions. The certiorari is a well-known writ, bringing up the record
only. The parties are plaintiffs and defendants in error, and not
appellants and appellees. The argument on the facts was there-
fore outside of the record. That the merits belong exclusively to
the court below, and cannot be reviewed here, is a settled ques-
tion: Carpenter's Case, 2 Harris 486. The court there quashed
the certiorari, Gibson, C. J., saying that, "having no appellate
jurisdiction, it would not be respectful or proper to express an
extra-judicial opinion on the regularity of the proceedings." In
like manner this court quashed the certiorari in Ewing *v.* Filley,
7 Wright 384. "Our duty," said Lowrie, C. J., "is a very
restricted one; for, as is admitted, we cannot retry the case on
the evidence, but can only consider whether it was tried before
competent authority and in proper form." What the certiorari
brings up is equally clear. This is very plainly stated by Wood-
ward, J., in Chase *v.* Miller, 5 Wright 412–13, a contested elec-
tion case. After explaining our general power of review, he says:
" But this statement is to be received with a very important qua-
lification—that the errors to be reviewed shall appear on the record.

[Election Cases.]

This is necessary to all appellate jurisdiction where cases come up by writs of error or certiorari. The only mode provided by law for bringing *evidence*, or the *opinion* of an inferior court upon what is technically called the record, is by a bill of exceptions, sealed and certified by the judges; and as bills of exception are not allowed in the Quarter Sessions, no question which arises out of the evidence in that court can be got up into this court. Hence, while certiorari lies to the proceedings of the Quarter Sessions in road cases, in pauper cases, in *contested election* cases, and in other statutory causes committed to the jurisdiction of that court, the writ brings up nothing but what appears on the record, without a bill of exceptions." That neither the testimony, nor the opinion of the court, is brought with the record by a certiorari, has been reiterated over and over again. I refer to a few of the recent cases to show that we have not departed from the doctrine of our predecessors: Commonwealth *v.* Gurley, 9 Wright 392—Indictment, per Thompson, J.; Church Street, 4 P. F. Smith 353—Road Case, per Thompson, J.; Oakland Railway *v.* Keenan, 6 P. F. Smith 198—Justice and Jury on Sheriff's Sale, per Woodward, C. J.; Plunket Creek *v.* Fairfield, 8 P. F. Smith 209—Pauper Case, per Strong, J. In Pennsylvania Railroad *v.* German Lutheran Congregation, 3 P. F. Smith 445, a strong effort was made to get before us the merits of a view and assessment by a railroad jury, and the subject was again examined elaborately, and the same conclusion reached. The strenuous effort to induce us to review the testimony, calculations and opinion of the court in these cases was, therefore, contrary to the settled law of the writ of certiorari. This excludes from our consideration the report of the examiner, all the calculations and all the court did, either by striking out or purging polls. They are not in the record, and all assignments of error founded on them fall.

Putting aside, then, these lures to error, the remaining assignments may be treated under three heads—those affecting jurisdiction ·hose relating to the procedure of the court, and those relating to the frame of the complaint. The first involving the jurisdiction is the oath to the petition. This concerns the city officers only. The Act of 1854 requires that " at least two of the complainants shall take and subscribe an oath or affirmation that the facts set forth in such complaint are *true.*" The oath to the petitions reads " that the facts are true *to the best of their knowledge and belief.*" This addition, it is asserted, lessens the strength of the oath— that the law requires the absolute truth of the facts to be sworn to, and not the best knowledge and belief of the affiants. Does the law mean absolute verity? This is the question. The intention of the lawgivers must be discovered, not only from the words, but from the object of the law, the special purpose of the oath, the nature of its subject and the character and jurisdiction of the

tribunal.  The object of the law is to give the people a remedy. It is their appeal from the election board to the court from an undue election or a false return.  The law is therefore remedial, and to be construed to advance the remedy.  The special purpose of the oath is to *initiate* this remedy—to give it the impress of good faith and probable cause.  The *proof* of facts must *follow*, not precede the complaint.  It is contrary to our sense of justice and to all analogy, to say that a remedy shall not begin till the case has been fully proved.  The law being remedial and the oath initial only, it is not to be supposed the legislature, representing the people, intended to subject the remedy to unreasonable or impossible conditions.  The remedy would be worthless and the legislature stultified.  Correct interpretation will shun this result. This brings us to the subject of the oath.  In a city of 800,000 inhabitants, embracing a surface of many square miles, no two nor two hundred men can be invested with the ubiquity and the omniscience to see and to know all the facts in every precinct necessary to contest the whole poll of the city.  Nay, they could not, from personal knowledge, contest the poll of a single ward. Besides, there are essential facts they cannot know personally. They cannot pry into the ballots.  They may believe, or may be credibly informed, that 153 unqualified persons voted a certain ticket, but they cannot know it ; yet this knowledge is essential to the contest.  Their knowledge, to be personal, must be as ubiquitous as the fraud, and as thorough as the whole number of voters, their residences, qualifications and ballots, and comprehend all the unlawful acts of every election board.  In this instance 120,000 votes were polled in 266 precincts.  Now, it is simply impossible that two, nay, all the fifty petitioners could personally know the facts necessary to contest the poll of the entire city.  The legislature did not mean this vain thing. *Lex non intendit aliquid impossibile.  Lex nil facit frustra—nil jubet frustra.*  It is the duty of a court to construe a statute, if possible, *ut res magis valeat quam pereat :* Huber *v.* Reily, 3 P. F. Smith 115, 117.  These principles have been stated with much force, and with reference to the highest authority, in Schuylkill Navigation Co. *v.* Loose, 7 Harris 18, 19.  The case comes, then, right to this point.  The oath must be made from credible information, or not at all.  In the poll of such a city the affiant cannot swear to more than to the best of his knowledge and belief. It would be an imputation on the framers of the law to think otherwise.  The argument that no indictment would lie for perjury upon this form of oath is fallacious.  If the act means an oath in this form, then the oath in that form is an oath authorized by law, and an indictment for its corrupt and wilful breach will lie.

We must consider also the tribunal to hear and decide on the

petition.. It is a high constitutional court, competent to decide on its own jurisdiction. Its jurisdiction being exclusive and final, it necessarily decides it for itself. There was no omission of anything to confer jurisdiction. The petition came from the requisite number of qualified voters, was presented in due time, and its truth was sworn to by two of their number. The court having a rightful and general jurisdiction over the subject of the petition, assumed it, heard the proofs and found the facts alleged to be actually true, and set aside the return as false. Now, after a decision on the merits, which have been established on sufficient evidence, can we oust the jurisdiction for an alleged error in the interpretation given to the language of the oath? This would be dangerous ground to take. The law does not prescribe the *form* of the oath. It certainly was for the court, in judging of its own jurisdiction, to interpret the words of the affidavit. It did so; heard the case; found the facts to be true, and decided on the merits. See Carpenter's Case, 2 Harris 486; Overseers of Tioga *v.* Overseers of Lawrence, 2 Watts 43; Plunket's Creek Township *v.* Fairfield Township, 8 P. F. Smith 209.

The question as to the power of the city recorder to administer the oath stands on the same footing. It was a question which the court below necessarily decided for itself. There was an oath actually taken and certified. The officer certifying it has power to administer oaths. His commission was conferred by the governor, by and with the consent of the Senate, for a term of ten years and during good behavior. His character is also judicially recognised as magisterial: Rhoads *v.* Commonwealth, 3 Harris 277. By the Act of 1817, he has authority to take the proof of deeds and other writings, and to issue writs of habeas corpus, and give relief thereon as fully as the president of the Common Pleas. These powers imply his authority to administer oaths, without which he could not swear the witnesses. The Act of March 31st 1860, punishes perjury committed upon an oath taken before the recorder, classing it with oaths taken before any judge, justice, alderman, &c., before whom oaths may be taken. The Court of Common Pleas had decided also that he had the authority to administer oaths: Schuman *v.* Schuman, Legal Intelligencer, 1867, p. 21. Thus, being a commissioned officer, and having power to administer oaths, by his certificate of probate to the petition he asserted his authority to administer that oath. Primâ facie, therefore, the oath was regularly made, and being accepted, was before the court. The court, having a general and rightful jurisdiction over the subject of the petition, assumed it, and in so doing decided the affidavit to be sufficient. It is not the case of the absence of any affidavit, but is the case of an affidavit, primâ facie, regularly made. Now, after having possession of the case in a manner clearly legal and regular, at least to a primâ facie

extent, and after having heard the case on its merits, and found the truth of all the facts necessary to a case on the merits, how can we go behind the certificate of the recorder to inquire whether his conceded authority to administer oaths extends to this particular proceeding? The oath was only necessary to initiate the proceeding, which has now been proved by sufficient evidence to be well founded and true. If we can now go behind his certificate, after a decision on the merits, no proceeding is safe. We may as well inquire whether all the petitioners were qualified voters, and if we find one disqualified by non-residence, non-payment of taxes, or a defect in his naturalization certificate, set aside the whole proceeding. This would be a dangerous doctrine, and opposed to the principles decided in the cases just referred to.

The correctness of the oath in these cases is supported by that required to contest the election of the governor, members of Assembly, judges, county officers, &c., to wit: That the "facts stated in this petition are true to the *best of their knowledge and belief.*" It cannot be supposed the legislature meant to exact severer terms in order to contest an election of city officers—indeed, to require an impossible condition. But analogies are appealed to. It has been decided that an appellant from an award must swear that he firmly believes injustice has been done, and less will not suffice. This is true, but the difference lies between knowledge and belief. It is not unjust to require of a suitor knowing his own case a firm belief of injustice. On the other hand, suppose we were asked to say that the appellant must swear to the absolute truth of injustice, and thus compel an ignorant man to swear to the law, as well as the fact? This would be unreasonable, and it is quite as unreasonable to ask a man, who cannot know all the facts, to swear absolutely to the illegality of voters, for whom they voted, the law of residence, of suffrage, and of the duties of election officers, and all else that is necessary to actual knowledge of an undue election.

Nor is the argument good that the Act of 1806 requires the direction of the Act of 1854 to be strictly pursued. Before a statute can be pursued we must know what it requires. If the law require personal knowledge the oath must be so. But this is the very question to be decided, and it is illogical to tell us it means personal knowledge because it must be strictly pursued. What does the Act of 1854 require—personal knowledge of every fact averred, or only knowledge to the best of reliable information and belief? If personal knowledge be not required, that ends the question, and all the numerous authorities cited to show how strictly a statute must be pursued are inapplicable.

Nor can the petition be likened to a response in chancery. It is not a proceeding to compel a discovery of facts known to the party, but is simply a complaint to initiate an inquiry in good

15 P. F. Smith—3

faith. Its foundation can be reliable information only, and therefore not absolutely but credibly true. In conclusion, on this, the only serious question, we have ample authority so to construe this act. "As to the construction of statutes, it is certain they are not always to be construed according to the letter:" Bank of North America *v.* Fitzsimmons, 3 Binn. 356.. "Acts that give a remedy for a wrong are to be taken fequitably, and the words shall be extended or restrained according to reason and justice, and according to their end, though the words be short or imperfect:" Schuylkill Navigation Co. *v.* Loose, 7 Harris 18, citing 2 Inst. 152, 249, 395, 572, and Hob. 157, 299. The word "void" has been held to mean "voidable:" Braddee *v.* Brownfield, 2 W. & S. 271. "Or" to mean "on:" Levering *v.* Railroad Co., 8 Id. 463. "Or" also has been held to mean "and:" Foster *v.* Commonwealth, Id. 79, 80.

Was the jurisdiction lost by the expiration of the term in the case of the prothonotary? In this respect the law is directory only. The act to be done is judicial and not ministerial. The court cannot "proceed on the merits" of the contest without time to take the testimony, and to hear and decide. If the testimony be voluminous, as it must be to correct so large a poll, the merits cannot be reached without time, nor can the merits be reached if delayed, as here, by dilatory motions. It would be a harsh construction to defeat its own purpose by requiring an impossibility of the court. Analogies are against it: Commonwealth *v.* Sheriff, 16 S. & R. 304; Ex parte Walton, 2 Whart. 501; Commonwealth *v.* Jailer, 7 Watts 366; Clark *v.* Commonwealth, 5 Casey 129. In these cases a similar limitation was held not to oust the jurisdiction of the court, and it was said: "There is no doubt that necessity, either moral or physical, may raise an available exception to the statute." The Act of 1810 requires certioraris to justices of the peace to be decided "at the term to which the proceedings are returnable." Yet what lawyer ever heard that a certiorari fell with the expiration of the term? It would be a mockery of justice were the people told, when seeking redress against dishonest servants, that the voice of the judge is silenced in the midst of his sentence, or the uplifted arm of the law struck down, by the stroke of the clock. The matter has been well stated by Allison, J., in Stevenson *v.* Lawrence, 1 Brewst. 134–5.

The next head is the alleged errors of procedure. The power of the Quarter Sessions to appoint an examiner is questioned. This affects the case of the district attorney only. The constitution and powers of the Court of Quarter Sessions under the Organizing Act of 16th of June 1836 leave no doubt of its power to take depositions, and consequently to appoint examiners, for this purpose. This is the practice in road and pauper cases. The Quarter Sessions is classed with the other courts in this act in

respect to many of its powers; and the 21st section enacts,—
" each of the said courts shall·have full power and authority to
establish such rules for regulating the practice thereof, and for
expediting the determination of writs, causes and proceedings
therein, as in their discretion they shall judge necessary or proper:
provided, that such rules shall not be inconsistent with the con-
stitution and laws of this Commonwealth." This being an enabling
act, is to be liberally construed. The power to establish rules for
all cases embraces the power to make a rule in the particular case.
*Omne majus continet in se minus.*

The next error of proceeding alleged is the allowance of the
amendment in the cases of district attorney and prothonotary.
This was not error, but fell within the sound discretion of the
court. The grounds of allowance are not in the record, and can-
not be reviewed by us. The amendment was not of an omitted
prerequisite necessary to confer jurisdiction, nor of matter essen-
tial to the frame of the petition, but was a mere specification of a
fact comprehended within the general terms of the complaint, and
belonging only to the proof. The miscount of 40 votes for Shep-
pard, which belonged to Gibbons, occurred at the same election,
entered into the same general return, and affected the result. The
matter pertained to the same case, and was necessary to deter-
mine it " on its merits." The power of amendment exists at
common law, and falls within the discretion of the court, and can-
not be revised. To the numerous authorities cited by the defend-
ant in error we may add Grove's Appeal, 1 Wright 443; Cambria
Iron Co. *v.* Tomb, 12 Id. 387; Id. 445; Boyd *v.* Negley, 4
Id. 377; Same *v.* Same, 3 P. F. Smith 387; Pennsylvania Rail-
road *v.* German Church, Id. 445. And in point of reason, why
should the court not have power to amend in a contested election
case? It is a judicial remedy, and concerns important rights.
On what ground should the cause of the people be held so strictly
that a mere specification of facts, within the same general com-
plaint, relating to the same contest, and the same returns, could
not be allowed in order to reach the very " merits" the court is
ordered to try? It does not appear from the record that the mat-
ter was illegal, or was objected to, or that surprise was alleged, or
was matter not developed in the testimony. The right of a court
to make an order necessary to the justice of the case, *nunc pro
tunc,* cannot be questioned. In Fitzgerald *v.* Stewart, 3 P. F.
Smith 343, a power was supported to enter judgment, *nunc pro
tunc,* six months after verdict, in an action of slander, to prevent
an abatement of the suit by the death of the plaintiff, and after
motion for a new trial in arrest of judgment, and to abate the
writ. In Slicer *v.* Bank of Pittsburg, 16 How. 571–579, a judg-
ment *nunc pro tunc* was entered in 1836 to support a sheriff's sale
made in 1820, and was sustained upon numerous authorities.

[Election Cases.]

The last head is that concerning the frame of the complaint. The refusal of the court to quash the petition is not a ground of error. Their jurisdiction is entire and exclusive, and a motion to quash is a matter of discretion : Resp. *v.* Cleaver, 4 Yeates 69. In this court there can be but one inquiry : Whether the petition is sufficient in its frame, and sets forth a proper ground of contest ? We shall do the plaintiffs in error full justice in permitting the assignments of error to stand as an exception to the sufficiency of the petition. Like an indictment, a bill in equity, or a libel, when the record of it is before us, we can only inquire whether it sets forth a sufficient charge or complaint. The evidence in support of the charge is a different matter, and need not be set forth or specified. The law does not demand it, and no analogy requires it. Indeed the reverse is true, for the court is required to " proceed on the merits thereof," indicating thereby that the proceeding is not to be embarrassed by technicalities. Then why should a contested election petition have more precision than other complaints at law, civil or criminal ? The remedy to set aside an undue or fraudulent election is as important as remedies for other injuries. If the life, liberty, property and happiness of the citizen demand certainty to a common intent only, why should a contested election require more ? Indeed, the nature of the subject demands even less. The innumerable frauds abounding in an election, where 120,000 votes are polled in 266 precincts, render a minute specification impossible within ten or twenty days. The only safe course in such a case is to proceed in analogy to the practice in other cases, by a notice of particulars, ordered and governed by the discretion of the court. It would be an intolerable technicality if the petitioners were required to set forth in their complaint, within ten days after the election, every illegal vote, every illegal act of the election boards, and every instance of fraud. Such a nicety would prevent investigation and defeat the remedy itself. The general rule in all pleadings is that certainty to a common intent is all that is required : Heard's Stephen's Pl. 380. The early decisions in this city were too stringent. A much truer exposition of the law, and one to be adhered to, is found in the opinion of the late Judge Thompson in Mann *v.* Cassidy, 1 Brewst. 26, 27. As remarked by him : " The rule must not be held so strictly as to afford protection to fraud by which the will of the people is set at nought, nor so loosely as to permit the acts of sworn officers, chosen by the people, to be inquired into without adequate and well defined cause."

We find many analogies to guide us. The general rule in all indictments, says Sergeant, J., is that the charge must be positively averred ; but in what cases it is or is not sufficiently averred, is not ascertained with precision, and must be left, in a great measure, to the legal discretion of the court. Certainty to a com-

mon intent in general only is required, and not certainty in every particular: Sherban *v.* Commonwealth, 8 Watts 212. Whether a bill of particulars or specification of facts shall be required is exclusively in the discretion of the presiding judge: Whart. C. L. § 291, citing Commonwealth *v.* Giles, 1 Gray 466; Rex *v.* Kendrick, 5 Ad. & El. 49 (7 C. & P. 184); Rex *v.* Hamilton, 7 C. P. 448. See also Commonwealth *v.* Hunt, 4 Metc. 125. In a libel for divorce it was held that the proper practice is to give notice that between two specific dates acts of cruelty, &c., are intended to be proved: Steele *v.* Steele, 1 Dallas 409. See also Garrat *v.* Garrat, 4 Yeates 244.

There are many cases at common law and under statutes, where the description is general, and because of the multitude of particulars constituting the offence or complaint, the prosecutor may be required to give notice of the acts intended to be proved. Thus in the case of a common barrator: 1 Russell on Cr. 185–6; 2 Hawk. C. L., c. 25, § 59. And disorderly houses, houses of ill-fame and gaming-houses: Whart. C. L., 4th ed., § 289. Tippling-houses: Commonwealth *v.* Baird, 4 S. & R. 141. Lottery tickets: Commonwealth *v.* Gillespie, 7 Id. 469. Timber trees: Moyer *v.* Commonwealth, 7 Barr 439. The court remarked in the last case that the legislature never intended that an indictment for cutting timber trees should be so special as to defeat the end proposed. We may refer also to the case of Barker *v.* Commonwealth, 7 Harris 412, for using vulgar and obscene language to crowds; and Commonwealth *v.* Mohn, 2 P. F. Smith 243, the case of a common scold. And see Edge *v.* Commonwealth, 7 Barr 277, and Commonwealth *v.* McKisson, 8 S. & R. 420.

In view of this array of cases affecting the highest absolute rights of individuals, it is impossible to affirm such a stringent rule as we are asked to apply to contested election cases, or to say that this petition is so fatally defective in its frame, it should have been quashed on motion, or set aside on demurrer. It sets forth in befitting terms the general election of 1868, the persons voted for, the number of votes returned for each, and the majority for the persons returned; charges an undue election and false returns, alleges the election of the opponent, and sets forth the grounds of the illegality of the election. It charges that the officers of the election fraudulently conducted and carried on the election, with a wilful disregard of all the requirements of the law, and then specifies their various fraudulent acts by means of which the fraud was perpetrated, and illegal votes suffered to be cast for the persons returned. Here I may notice, in passing, the omission to set the letter V opposite the names of the electors who had voted. This is specified in the petition as one of the *fraudulent acts* of the election officers, and not as a cause in itself sufficient to set aside the election. The petition then avers that all these acts

were done and committed with the intent and purpose of holding an undue election, and to prevent an honest expression of the popular will and a *true ascertainment* of the real votes of the qualified voters, and that in pursuance of this conduct the popular will was not ascertained, but was defeated, whereby the election was rendered false, fraudulent, undue and void, and the return void, and should therefore be disregarded. The petition does not close here, though much more descriptive and certain than most forms of indictment, petition and libel, but proceeds to specify the number of fraudulent votes received in the several divisions, describing them specially, numbering in the aggregate several thousands, and largely more than sufficient to overthrow the majority for the person returned as elected. Here is certainty, not only to a common, but to a very specific, intent. How can a petition so specific in its charges and minute in its specifications be deemed to be defective in its frame? Strong bias only can entertain a doubt of its sufficiency.

The argument that the claim of the petition to have certain returns stricken out makes it defective or unsound is wholly unfounded. If the facts set forth are sufficient, as we have seen they clearly are, the prayer to strike out does not vitiate the charge of an undue election and a false return. That charge remains, especially in view of the concluding prayers of the petition, which are strictly correct and cover the entire ground of the case. The prayer to strike out is no part of the charge in the complaint. The court may disregard it if. unfit, if too broad, or if unsupported by evidence, when there are prayers suitable to the case and covered by the evidence, and we are bound to believe they did disregard it. *Omnia præsumuntur legitime facto, donec probetur in contrarium.* The court having exclusive and final jurisdiction, we have no right to presume that it abused its powers. The evidence, calculations and opinions of the court, as we have seen, are not before us. We cannot judicially know whether the court struck out divisions, or merely found frauds sufficient to change the result. We know only the decree, and that is clearly right. The whole argument upon the power to strike out polls is outside of the record before us.

And even if it were conceded that the prayer to strike out were a defect in itself, yet the decree cannot be affected by it. The presumption now is, that if illegal the court disregarded it. This is supported by authority. Thus in Hazen *v.* Commonwealth, 11 Harris 355, this court held, upon an indictment of eleven counts, where, after a motion to quash was refused, a general verdict of guilty was rendered on ten of the counts and judgment arrested on two, that the judgment on the remaining eight would not be reversed, if any count be sufficient, and the first being found to be good. The same had been decided in Commonwealth *v.* McKisson,

[Election Cases.]

8 S. & R. 420.    And in Hartmann v. Commonwealth, 5 Barr 63, Burnside and Bell, JJ., said on argument: "The law of Pennsylvania is settled that if one count be good it is sufficient." So also as to several matters contained in the same count.    In Cotteral v. Cummins, 6 S. & R. 348, Justice Duncan said: "It is the law that where several matters are laid in the same count, part of which is not actionable, or not actionable in the form laid, if there are sufficient facts laid to support the action, it will be intended after verdict that damages were given only for such as were properly laid."    The same is said in 1 Chitty on Pleading 682, and the reason given, that the verdict will be sustained by the intendment and presumption that the judge duly directed the jury not to find damages on the defective allegations.    The same intendment was made in Weighley v. Webb, 7 S. & R. 310, the court remarking that it is not to be presumed that the judge would direct, or the jury would have given, the verdict without sufficient evidence of breach of contract.    The defect was therefore cured by the verdict.    There are many analogous cases: Stoever v. Stoever, 9 S. & R. 454-5; Kerr v. Sharp, 14 Id. 399; Turnpike Co. v. Rutter, 4 Id. 6; Sedam v. Shaffer, 5 W. & S. 529; Corson v. Hunt, 2 Harris 510; Seitz & Co. v. Buffum & Co., 2 Harris 69.    In this case the intendment should be even stronger, for the court being the exclusive judge of the facts as well as the law, we cannot suppose the decree was rendered on incompetent or insufficient evidence.    "The courts make every reasonable presumption to rid themselves of objections which do not touch the merits:"    Per Rogers, J., Seitz & Co. v. Buffum & Co., supra.

Thus it is evident, from this array of authority, no presumption can be drawn from the decree that the court struck out divisions because such a prayer is contained in the petition.    The decree itself furnishes no such evidence, while the prayer, if illegal, we must now presume, was disregarded, upon the legal intendment the cases all say should be made.    The argument, therefore, founded on the decree following the allegata et probata is a non sequitur, and illogical.    The probata are not before us, while allegata are not presumed to be followed contrary to law.    But in addition to this general principle we have an authority in point. In Ewing v. Filley, 7 Wright 384, it was held that the proceedings could not be reversed because of contradictory averments in the specifications, but the proper course would have been to move the court below to strike out the contradictory part, and the certiorari was quashed.    There was no motion in the present cases to strike out this prayer as illegal.    The only motion was to quash. Upon the whole record in these cases we discover no error, and the several decrees are therefore affirmed.

THOMPSON, C. J., filed the following dissenting opinion :—I propose to present some of the many considerations which impel me to differ in judgment from the majority of the court in the conclusions just announced in the foregoing cases; not, I am aware, that it will change the determination arrived at, or amend what I think wrong, so far as these cases are concerned; but as they result in that which concerns the people more than anything which has hitherto emanated from this court, and as the opinion delivered discusses mainly the questions involved with a view to support the conclusions arrived at, I think it proper the people should hear something more of the other side. I propose only to present some of the reasons which impel me to express my difference of opinion with that of the majority. To give all which I regard as cogent would require labor that I have neither the time nor strength to perform.

At the annual election of 1868, the above named persons were candidates for the respective offices mentioned, and they, together with the mayor running upon the same ticket, were returned as duly elected by the return judges, the majorities ranging from 1838 for the mayor, 1275 for district attorney, and down as low as 200, and some odd for the receiver of taxes. These majorities were the result of the judgment of over 2500 sworn officers of all parties in politics. Certificates of election were delivered to these several officers, including the mayor, and, with the exception of the prothonotary of the Common Pleas, all entered upon the performance of their official duties. But a contest of these elections was gotten up very soon thereafter, and that has been pending ever since. The duties have been performed by the city officers, without compensation, for a year and a quarter, their fees having been impounded in the hands of receivers. All the doings of this army of judges, certifying under oath to the action of the people at that election, have been reversed, set aside and annulled by the decision of a divided court below, and affirmed by a divided court here.

The worst feature of the times, so far at least as this city is concerned, is, that elections by the people determine nothing. The election day but inaugurates a contest to set aside what has been done on that day, and the contest is carried on under the management of able lawyers, assisted by skilful manipulators, and the voice of the people has less chance, in my opinion, of being heard in the result, than it would in even an exaggeration of the disorders at the most disorderly of the polls. If every county in the Commonwealth were to emulate Philadelphia, no election would be decided within a year after it had taken place, and courts and lawyers would be constantly engaged in semi-political contests the year round. That elections may be contested under the election laws admits of no doubt; but to aid in facilitating

such contests by the extension of the law beyond its letter, is what was not intended by the legislature, is not according to the settled rules of construction of this court, and is forbidden by statute. That has, in my judgment, been done in these cases, as will, I think, be shown in the sequel of this opinion.

That the rule is as stated, I cite the Act of Assembly of the 21st of March 1806, which provides that "in all cases where a remedy is provided, or duty enjoined, or anything directed to be done, by any Act or Acts of Assembly of this Commonwealth, the directions of the said acts shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the provisions of the common law in such cases, further than shall be necessary for carrying such acts into effect."

A multitude of decisions recognise the rule of this statute as applicable to both civil and criminal cases. No lawyer or judge would for a moment think of disregarding it. That it is applicable to election contests The Commonwealth v. Garrigues, 4 Casey 9, settles. This court in that case said,—"When a statute prescribes a mode of inquiring into and determining the regularity and legality of a municipal election * * * the remedy provided by the statute must be followed, to the exclusion of the common law mode of redress." I will quote from another case, of the hundreds on the same subject in our books, to establish the rule. In Monongahela Navigation Co. v. Blair, 8 Harris 71, Black, C. J., delivering the opinion of the court, said, "Where a new and extraordinary remedy, out of the course of the common law, is given by statute, the party, if he adopt it at all, must pursue it to the letter." To the same effect are the following citations: 4 S. & R. 135; 2 Jones 350; 3 S. & R. 295; 3 Penna. R. 65; 7 W. & S. 362; 7 Watts 517; 6 Casey 417; 1 Jones 298, &c. I might multiply authorities ad infinitum to the same effect.

Every provision for contesting elections is directed by statute. None of the proceedings are in the course of the common law. Elections by the people were unknown to it. It has no machinery adapted to such issues. The process is all ordered by Acts of Assembly. They provide for the filing of the petition complaining of an undue election or false return, as the case may be; prescribe the time within which it is to be filed, within how many days, by how many voters to be signed, how to be sworn to, and that the court shall fix a time for the hearing. These are statutory provisions, and the proceedings must follow them to the letter, say the Act of 1806 and the decisions referred to.

If it can be shown that the statute has not been followed in essential particulars in these proceedings in the courts below, how are they to be affirmed without disregarding the mandate of the Act of 1806, and the whole current of authorities existing upon it? To disregard these is to set the one aside and overrule the others.

[Election Cases.]

That they have been disregarded in the court below, I think I will show.

The first of these cases to be noticed is that of the district attorney, Mr. Sheppard. In this case, as well as in the others, four entire precincts were struck out of the count in the court below. He had a majority in all of these precincts, aggregating 1570 votes. If but the one-twentieth of these were legal, and had been counted, Mr. Sheppard would have been elected in spite of a mistake against him in the court below of thirty-six votes, and the votes counted out by an amendment, out of time, of the petitions;—after argument—and which is not to be supported upon any ground that I can see.

But in this court it is said we have no means of knowing upon what the judgment of the court below was rested in deciding against the district attorney. This is a sort of demurrer to the relief sought in this case, which is very like an implied admission of error, accompanied by an effort to close our eyes to the examination of the principles upon which it was done. If we cannot judicially examine such a position, there is nothing whatever to control a judgment which might disfranchise fifteen thousand voters, as well as fifteen hundred. The enormity of such an act might be some protection, but the principle would remain. That we cannot examine it, is the opinion of the majority. From this I earnestly dissent.

Let us for a moment see whether we cannot reach the elements of the judgment pronounced through the pleadings on which it was founded. The petitions for contesting the elections in the court below complained of several matters, viz. : That there were fifty persons and upwards, not entitled to vote, in the 6th division of the Third Ward, and fifty-four votes were polled for Sheppard which were not on the commissioners' lists; that the letter V was not entered after the votes; that the election officers fraudulently refused to inquire as to the qualifications of voters; that they fraudulently received the votes of non-residents; and so charging, prayed "that such election, so held in such division, was false, fraudulent, undue and void, and the return thereof was false, and should be stricken from the general return, and be wholly disregarded." The like charges and like prayers were made in regard to the 7th division of the Third Ward, and the 6th, 7th and 8th and several other divisions of the Fourth Ward. The last four returns were on these specifications entirely stricken from the general return, which resulted in a deduction of 1570 votes from the candidates declared elected by the general return.

The respondents moved in each case to quash, on account of these specifications not being within the jurisdiction and power of the court to act upon, for the causes therein set out in them. This motion was called a demurrer to the petition. If so, the

judgment of the court upon it against the demurrer should bring it upon the record, where it is claimed it is not, and then we could review it; if not, it was retained as part of the record after judgment of the court to that effect, and defines the jurisdiction exercised by the court after judgment upon it. It stands by the judgment of the court, as the *allegata* to be sustained or met by the *probata*, and of course tests the judgment in the cases. It will not be doubted but there must be a complaint by petition in cases of contested elections. The letter of the law is plainly to this effect. If but a single charge existed in a complaint, the conclusive presumption would be that the judgment upon it followed the *allegata* and *probata*, as they follow each other, and thus the judgment could be tested by the former. If the *allegata* were beyond the jurisdiction of the court, the judgment would also be. In Gordon *v.* Kennedy, 2 Binn. 287, this principle was distinctly decided. The court said: " When the plaintiff declared upon a contract consisting of several parts, and assigned, among other breaches, one which, from his own showing, could not have taken place before suit brought, the court would not intend that the damages assessed generally were given only for that matter in the count which was actionable, and would therefore reverse the judgment. The judgment being as well on the bad as on the good counts of the *narr.*, it was a presumption of law that the bad led to the judgment as likely as did the good. The court, therefore, testing the judgment by the *allegata*, and not being able to discriminate on which count it was given, set it aside. If there be good and bad counts in a *narr.* and a general judgment, it cannot stand. This is a universal rule in all civil actions. In criminal cases, if there be a single good count in the indictment, the judgment will be sustained. The proceedings in these cases are not under the criminal law. Had they been, the court would hardly have sent them to examiners. Testing the final decree by what was in issue in the petition, the former cannot be sustained; if the latter be illegal—and it is so if beyond the jurisdiction of the court. I ask where is the communicated authority to the courts to try a division by its character without regard to its voters? It is not in the law.

The argument that the legal voters of a district may be disfranchised by the base conduct of the election officers, or because frauds have been committed by illegal voters, without the slightest fault of the former, is the position of the contestants. The specifications in the petitions which lead to and culminate in the relief prayed, to wit, to strike out the entire vote of the divisions mentioned, have each, I believe, been heretofore held to be insufficient for such a result. In Mann *v.* Cassidy, 1 Brewster 11, allowing unassessed voters to cast their votes without the statutory proof was held not to be sufficient. So omitting to place the letter V

after the name of the voter was held not sufficient: Weaver *v.* Given, 1 Brewster 140, and Skerrett's Case, 2 Pars. 509. Receiving illegal votes merely, not sufficient to strike out the poll: Weaver *v.* Given, *supra.* It would be absurd to hold that refusing to hear a challenge would be sufficient. In such cases it is to be presumed the officers know the voter to be entitled to his vote when they disregard the challenge. These items constitute the volume of the force applied to strike out these four divisions, and it had the effect. I maintain that there is nothing which will justify the striking out of entire divisions but an inability to decipher the returns, or by showing that not a single legal vote was polled, or that no election was legally held. If anything short of this is to have the effect, the right of every elector is at the mercy of the election officers. Such a right is no right; is worth nothing. I make my especial dissent from any such practice or rule. It was not alleged that no legal votes were polled at these divisions. It is morally certain there were many. But all were stricken out on the character of the precincts rather than upon the votes polled. The honest were made to answer for the dishonest. This is a change in moral and legal ethics, it must be admitted! The poll might have been purged; at least the attempt ought to have been made. This was not done, and the whole were stricken out with a dash of the judicial pen, and enough votes deducted from those returned elected to elect the contestants. The court below so decided, and we judicially know it. Whether that can be done is a very grave question. If it may be done without review as to four divisions, it may be done in two hundred and sixty-four, leaving the balance to make the election. On no principle could it be done but upon the *allegata* of the petition. That, I say, ought not to have been permitted to be done. If not reformed in the court below, where it ought to have been, we ought to reverse the proceeding, because we know it was the means whereby the elections of the people have been overborne, and that of the courts substituted, contrary to law and the principles of the government.

But I regard it as improper in the case of the city officers in another aspect. The Act of Assembly in their cases requires that the contest shall proceed on the merits. And what are the merits? Certainly that every legal vote cast shall be counted, not thrown away. It is not a decision on the merits which casts out of the count indiscriminately sound votes, because there may be some unsound among them. A party who contests an election undertakes to prove the unsound votes which are to change the result. If he cannot do it, he loses his case for want of proof, as many a man does. The returns of the election officers stand for proof that the votes counted were properly received, and the contestant enters the lists and proffers to make good his challenge of

the election, and he is bound to show that on the merits the election was with him—not with him on any rule which throws out his adversary's votes, enough at a time to produce the result. Does any man in his sober senses believe that there were no legal votes cast in these four precincts, thrown out bodily? If not, why ought they not to be counted? If counted they would settle the election on its merits. The act requires it to be so settled, and in no other way. The specification of illegal votes charged as given in those precincts was not one-tenth of those stricken out in favor of the contestants. There were 1570 votes returned as majorities for each of the respondents. They were every one thrown out, and by this means, and this alone, the contestants have succeeded. I aver that on the face of the Act of July 2d 1839, which reaches the case of the prothonotary, and the Act of 1854, which reaches the city officers, the *allegata* not touching the merits as the law requires, was a bad count in the contestants' bill or *narr.*, and a general judgment thereon was erroneous. Nothing, I hold, can justify the exclusion of the count, when properly returned, but the impossibility to understand it, and that has often been held to be the rule in the court below: Mann *v.* Cassidy, 1 Brewster 11; Weaver *v.* Given, Id. 140. Nothing of this kind was alleged to be the case in the specification on which the returns of those divisions were thrown out. I think, without such an allegation, the judgment to exclude an entire return on any other ground was wrong. I would reverse for this also, and send the contestants back, to show that of the legal votes polled they received a majority.

I fear this power. It is not for this occasion I protest, but for all time. Better far that some errors should occur at the polls, nay, many, than that the free right of electors should be held for nought. I am of opinion that nothing in the specifications justified the throwing out of entire returns, and that there is enough on the record to enable us to reverse this part of the proceedings and judgment, and that we are bound to do so.

Mr. Sheppard's case was decided in the Quarter Sessions. That court did not hear the witnesses. They sent it to examiners, who took the testimony at other places than the court-room. The Act of Assembly requires that, in contested election cases in the Quarter Sessions, "the court shall appoint a suitable time for hearing such complaint, notice of which shall be given to the person returned, at least ten days before such hearing."

It will not do to say that the court has power to make rules—to authorize others to hear and report to it. The Act of Assembly requires the court to hear, not a part, but the whole case. And there is great propriety in this. The manner of testifying is, in every tribunal of modern times, a great means of detecting falsehood, or of becoming satisfied of the truth of the

witness. But the partial or false witness's testimony reads as well, and often better, than that of the truthful one. The legislature trusted the courts in this regard, not to throw aside any of the means of truth, but to use them all, and then decide. That the hearing of the case is to be in the presence of the court, the Act of Assembly is explicit, and reasoning to prove it is a work of supererogation. We were told, in the argument, that Judge King, a most eminent and experienced judge, appointed an examiner in an election contest in the Quarter Sessions, but struck the appointment off as against the Act of Assembly. Whether this be reliable I know not, but that this able and accurate judge would do so is most probable. He could not overlook the importance of hearing the witnesses, and the greater importance of complying strictly with the Act of Assembly.

It is no answer to say that the court has power to make rules. It has, but not for cases where the law requires its personal supervision. If it can appoint examiners it might appoint a master, as is done in equity, and neither hear the testimony nor read it. There is not a shade of difference so far as the power is concerned. I would send this case back to the court for a rehearing on this ground. If this overworked tribunal has not time to do this duty according to law, and the other business required to be done by it, increase its force. No statute was ever set aside because the court had not time to execute it. If the court had the time there is not even an excuse for not hearing the witnesses, much less a defence for the omission.

But there is still a greater error in the Sheppard case. After it had been heard and argued, an amendment was allowed to the contestants, by which the return in the 16th division of the Twentieth Ward was changed so that there were deducted from Mr. Sheppard forty votes. That an amendment might have been made at a proper time I need not deny; but to make it after the testimony was closed, and the argument also, was an excessive exercise of discretion, in my judgment, that would require the reversal of the final decree, if nothing else did. It was a trial without the specification of material matter. Nobody has ever yet asserted that no specification was required. This is certainly what the law does require, else why this provision, that the facts set forth in the complaint "are true to the best of the affiant's knowledge and belief?" This is not a common law proceeding, and the statute is violated in not setting forth the facts contained in the amendment in the original petition, if material. But how would it stand at common law? In Gale *v.* Babcock, 4 W. C. C. R. 199, an amendment of a declaration in ejectment, by stating a demise under a new title, was not allowed. Amendment of the declaration offered after the jury was sworn, introducing a new cause of action, not allowed: Postmaster-General *v.* Ridgway,

Gilpin 135. Now, was this not a new cause of complaint? It was not in the original petition on which the contest proceeded. Where was it? In the breasts of the applicants, if anywhere. Was this the notice the law requires? Who will assert this? It was not only new, but was made decisive of the case, for we cannot presume that the thirty-six votes not counted would have been uncounted by the court. This mistake, and the interjection of this new cause of action, ousted Mr. Sheppard. This is morally certain. But even at common law an amendment introducing new matter is never allowed without allowing an imparlance: Thompson *v.* Musser, 1 Dallas 458. Inasmuch as it is denied that we can look into the judgment, and at the elements it is composed of, how do we know but this new matter ruled the case? It did in very fact, for the omission to count the thirty-six votes overlooked, gave Mr. Sheppard the majority. Were we to reverse for this, to me, manifest error of amendment, Mr. Sheppard is elected, and, I think, while notice is to be regarded as important to justice, we ought to reverse. The amendment was not sustained by any statute of amendment, nor of common law, and it is against the provisions of the statute under which the proceedings were conducted, as I think I have shown.

Now, as to Mr. Fletcher: The same objection exists to striking out the entire returns in the four divisions, one in the Third Ward and three in the Fourth, already noticed, and which need not be repeated in this or the succeeding cases; but it overthrew all the returns. But there is an objection fatal to the judgment in that case. The court lost jurisdiction by lapse of time. I admit that the objection has been well defended in the opinion of the majority, but not successfully. Prothonotaries, as I have already said, are constitutional officers, and hold their offices for three years, if they shall so long behave themselves well, and until their successors are duly qualified. For this very reason the Acts of Assembly providing for a contest of these elections, expressly direct that it must be heard and determined at the next term after the election shall have been held. This contest has been going on for over a year, and there is not a particle of reason why it might not be kept going until the next election for prothonotary, and then, if a new contest were inaugurated, the old officer might hold on until that should be determined, let the time be long or short. The constitution limits his commission to three years, subject to the contingency of holding over until his successor is qualified, and that contingency is limited by the Act of Assembly to three months. To disregard the time within which the case should be determined is a determination that there is no limitation. Yet the Act of Assembly plainly declares there is. The apology for disregarding this position is that it is directory. But the Act of 1806 expressly declares that "when

anything is directed to be done by any Act or Acts of Assembly of this Commonwealth, the directions of the said act shall be strictly pursued." This is plain, and settles the question. There is no difficulty in executing the directions of the act in this case. The Act of 1806 is the rule in every statutory proceeding or statutory remedy. There are very many cases in which the lapse of time destroys the remedy. An appeal from an award of arbitrators, begun to be taken, but not finished in time, is void. An officer's commission expires, a judge's for instance, in the middle of a trial, the unfinished portion goes for nothing. Instances will occur to every one in which the lapse of time deprives parties of remedies which they might have had by diligence.

But it was argued, peradventure the contest may continue beyond the next term. What then? The legislature must answer that, not the courts. But that a court could not, in three months, try any such contest, so far as to be ready for pronouncing its decision within the next term, is not to be credited. The mandate to hear and determine must be obeyed if all other business be set aside. In substance, the language of the legislature to the courts is what we find in an ordinary subpœna to a witness —that, "laying aside all business and excuses," you hear the case—nay, more—that you hear and determine it at the next term. When, therefore, the three months expires without a determination of the contest, the proceedings fall as effectually as if the court itself had ceased to exist. This is not to be denied without disregarding the very words of the act, and this no court can do, and do right. This case was before the Common Pleas more than four whole terms before it was decided. It might have remained the same number of years with as much respect to the statute. All that was done after the next term after the inauguration of the contest, in my opinion, was *coram non judice*, and for this the decree of the court should be set aside in this case, if there were no other ground.

The last matter I propose to notice is the form of the affidavits appended to the petitions for contesting the city cases. They are sworn to " according to the best of the affiant's knowledge and belief." But the Act of Assembly says " That at least two of the complainants shall take and subscribe an oath or affirmation that the facts set forth in such complaints are true." The departure from the directions of the statute—nay, its mandate, in these affidavits—was, in my judgment, so material as to require a dismissal of all of them, and that it should be so held by this court now. The dissenting opinion of Judge Ludlow proved this, if language can prove anything. It stands unanswered and unshaken by anything uttered below or here.

The cases cited to support the sufficiency of these affidavits are mere analogies, and are supposed to be applicable, because in

support of a remedial statute. But the cases cited to sustain the objection are parallels. By the Arbitration Act of the 20th March 1810, in order to obtain an appeal from an award, it was provided that the appellant should make oath or affirmation that the appeal was not for the purpose of delay, "but because he firmly believes injustice has been done." In Thompson v. White, 4 S. & R. 135, it was held by the court, in an opinion by Tilghman, C. J., that the omission of the word "firmly" from the affidavit vitiated the appeal, and it was stricken off. The same thing was held afterwards in Proper v. Luce, 3 Penna. R. 65, in an opinion by Gibson, C. J., in which he declared that the "defect was fatal." I have known many instances of appeals quashed for the same reason, and, I presume, the same is within the experience of other lawyers and judges.

The provision for an appeal was eminently remedial; it conserved the constitutional right of trial by jury; without an opportunity for which the Arbitration Act itself would have been unconstitutional, the provision on that subject in the bill of rights being "That trial by jury shall be as heretofore, and the right thereof remain inviolate." Yet even this great right was held to be preserved only by exact performance of that which the legislature had directed to be done. The appellant was required to swear that he firmly believed injustice had been done him in the award from which he appealed. No honest man would swear to anything he did not firmly believe, and all are presumed honest until the contrary is made to appear, and yet this word was held necessary, and is so to this day, more in obedience to the canons of construction I have referred to and the Act of 1806, than because of any inherent good reason. Two of the most eminent jurists that ever dispensed justice in this Commonwealth, held, in effect, that the remedial nature of the provision, in order to obtain an appeal, did not dispense with the requisites of the statute on which it was to be had.

I undertake to say, that not a syllable of the apology offered for the departure from the requirements of the statute as to the affidavits in these contested election cases, did not apply much more strongly to support the affidavits in the appeals mentioned. In neither is there a form of affidavit, or what it shall contain; it is simply descriptive. Nothing is more sacredly regarded in a country possessing free laws and free government than trial by jury; any provision to arrive at that is remedial, yet this result was set aside to carry out the intention of the legislature as to the mode in which it was to be had. Grant, for the sake of argument, that the provision for contesting elections is remedial, the cases cited abundantly prove that the remedy of the statute is only to be secured by complying with the terms which the legislature has seen proper to impose on the right.

15 P. F. Smith—4

But it is a great mistake to suppose that the two forms of affidavit are the equivalent of each other. They are not. There are thousands who daily make affidavits according to the best of their knowledge and belief, who really know nothing about the matter themselves. Everybody knows this. The election returns, made upon oath, should not be questioned but upon affidavits showing the fact of their untruthfulness, and hence it required in the city, care that the oath charging such facts should be positive. It is said that this could not be possible. Why not? What is to prevent the affiant from swearing to the existence of the facts, if he knows them; and if he does not know the facts he charges, what right has he to swear at all? If facts enough for a primâ facie case to overturn an election cannot be presented, as the law requires, then the judgment of the election officers remains conclusive and unimpeached. There is "ample scope and verge enough" for obtaining affidavits, positive in their terms, in contests about city elections. Twenty days are allowed. Fifty or five hundred persons may become complainants, and verify by oath, facts to sustain the contest. The number is not limited to two, and thus from every precinct charges on oath may come. But I have no concern with supposed inconveniences in the matter. *Ita lex scripta est* is the judicial motto. It was this that led the eminent jurists alluded to to hold, as have done all their successors, that the word "firmly" was essential to perfect an appeal. If we get away from it, we assume legislative as well as judicial functions. Perjury could not be assigned on an oath prescribed to be taken, but not taken, but on another taken—not prescribed. This is so obvious, I will not delay to prove it. The oaths taken in these cases are not the oaths required to be taken by the statute, but are very different. The petitions are not sustained by oaths known to the law of such cases. There is a recognised and well settled distinction between a positive affidavit and one founded merely on knowledge and belief. It will be sufficient to instance the case of affidavits to hold to bail. In point of form, the affidavit should be direct and positive, and therefore, if it be merely as the party making it believes, it will not in general be sufficient: 1 Tidd's Pr. 182, 4th Am. Ed., and cases in the notes. In 2 Miles 155, Young *v.* Corder, it was held, in the District Court, that "knowledge and belief" was not sufficient to hold to bail. So in Bland *v.* Drake, 1 Chitty's R. 165; 18 E. C. L. R. 100. I would hold all those petitions as insufficient for want of the affidavits required by the statute, and would reverse all the proceedings under them on the authority of the cases requiring the directions of the act, which provides for contesting the elections, to be pursued.

There are other matters in the opinion of the majority which I am not contesting. I know nothing about the authority of the recorder to administer oaths. The defects in the oaths themselves

are over and above all this, and I have pointed them out. I do not question that these cases are here on certiorari, and only the record is before us, but, in my opinion, it is much more largely before us, than the majority regard it to be. It is sufficiently before us, in my judgment, to meet every question discussed, and to enable us to determine them. And we should, in this great appeal from the people, astutely scan everything which militates at all against their right to settle their choice of officers in their own way. I would reverse all the decisions in the court below against the candidates returned duly elected by the people.

SHARSWOOD, J., concurred with THOMPSON, C. J.