# Morganroth Election Contest

144

*Charles E. Berger, Charles C. Lark,* and *Samuel Gubin,* for petitioners.

*J. Fred Schaffer, Harold F. Bonno,* and *John H. Bigelow,* for respondent.

PER CURIAM (LARRABEE, P. J., twenty-ninth judicial district, PALMER, P. J., twenty-first judicial district, GILBERT, P. J., seventeenth judicial district, specially presiding), February 21, 1942.—It appears from the records that a petition by 50 registered voters of Northumberland County was presented to Gov. Arthur H. James, of the Commonwealth of Pennsylvania, on November 21, 1941, complaining that there was an illegal election for the office of judge of the Court of Common Pleas of Northumberland County, which constitutes the Eighth Judicial District of Pennsylvania, held on November 4, 1941. Petitioners represented that the candidate William I. Troutman had been duly elected judge of said district and had received more legal votes than were cast for Charles K. Morganroth, the candidate who was returned by the county board of elections as having been elected to the said office. Petitioners prayed that their complaint be heard and determined and that it may be decided whether Charles

K. Morganroth or William I. Troutman had received the greater number of legal votes and which of them is entitled to the office.

Thereupon the Governor issued a commission on December 1, 1941, directing the three president judges residing nearest to the Court House of Northumberland County, to wit, Don M. Larrabee, president judge of the twenty-ninth judicial district, Cyrus M. Palmer, president judge of the twenty-first judicial district, and Cloyd Steininger, president judge of the seventeenth judicial district, to convene, without delay, the Court of Common Pleas of Northumberland County and proceed to hear and determine the complaint of the said petition as provided by sections 1736 and 1737 of the Pennsylvania Election Code of June 3, 1937, P. L. 1333.

In compliance with this commission the three judges proceeded to convene the Court of Common Pleas of Northumberland County on December 9, 1941, at 10 a.m.

At the first hearing before the court on December 9, 1941, the Attorney General's department presented the original petition, signed by 50 registered voters, and requested that the court direct it to be filed with the Prothonotary of Northumberland County and a receipt for said petition be returned to the Governor in accordance with the request from the Attorney General of Pennsylvania; whereupon, the court directed the petition to be filed with the Prothonotary of Northumberland County.

The following-named counsel entered their appearances in behalf of the contestants: Hon. Charles E. Berger, Hon. Charles C. Lark, and Samuel Gubin, Esq. The following-named counsel entered a special appearance, de bene esse, for respondent, Charles K. Morganroth, for the purpose of raising questions of jurisdiction in the proceedings: J. Fred Schaffer, Esq., H. F.

Bonno, Esq., and on January 20, 1942, John H. Bigelow, Esq., of Luzerne County, entered his appearance as counsel for respondent.

Section 1759 of the Pennsylvania Election Code provides that within five days after a petition has been presented to contest an election it shall be the duty of petitioners to file a surety bond, in such sum as the judges may designate, signed by at least five of the petitioners and with two or more individual sureties or a corporate surety, to be approved by the court, conditioned for the payment of all costs which may accrue in such contested election proceeding, in the event the said petitioners, by decree, shall be adjudged liable to pay the said costs, and if the said bond shall not be filed as therein provided the petition to contest shall be dismissed.

At the first hearing, on December 9, 1941, the court fixed the amount of the surety bond to be filed by petitioners in the sum of $5,000, and on the same day petitioners presented to the court a surety bond in the sum of $5,000, signed by five of the petitioners and executed by the Hartford Accident & Indemnity Company of Hartford, Conn., as surety, and the court approved the bond and directed it to be filed.

In accordance with section 1760 of the Pennsylvania Election Code a notice of the filing of this petition, with a copy of the petition, was directed to be served upon Charles K. Morganroth, respondent, whose right to the office is contested, together with a rule entered on him to answer the said petition at a hearing to be held in Sunbury on January 7, 1942.

When this contest court reconvened on January 7, 1942, A. Francis Gilbert, the recently-elected president judge of the seventeenth judicial district, presented his commission from the Governor of the Commonwealth of Pennsylvania, commissioning him to sit as a member of this contest court in lieu of Judge Cloyd

Steininger, whose term of office had expired on January 4, 1942, and this change in the membership of the contest court was directed to be noted of record.

At the hearing held on January 7, 1942, counsel for respondent presented a motion to strike off the surety bond, averring certain defects and irregularities with respect to the execution of said bond, and that the same did not meet the requirements of the Rules of Court of Northumberland County as relates to the filing of a bond by a corporate surety company. At this time a motion was made by counsel for respondent to quash and dismiss the contest petition and all proceedings thereunder. The court then issued a rule on petitioners to show cause, which was made returnable January 20, 1942, and fixed that date for argument on said rule.

Counsel for petitioners stated they intended to file a motion to amend their original petition, and, by agreement of counsel, it was directed that the contestants should file in the office of the prothonotary their motion to amend the petition, to be accompanied by a copy of the proposed amended petition, not later than January 13, 1942, and that copies of the same should immediately be served upon counsel for respondent.

At the hearing on January 20, 1942, counsel for respondent said they desired to file a motion to strike off the service of notice of the filing of the petition and the rule entered on respondent, averring that the service was not made in conformity to law. Thereupon the court conferred with counsel for the parties and they agreed that all three motions should then be orally argued before the court, to wit:

1. The motion to strike off the surety bond filed by the contestants.

2. The motion to strike off the service of notice of the filing of the petition and rule entered upon respondent.

3. The motion to quash the contest petition and the proceedings thereunder.

In seeking to have this bond declared void, respondent contends that the surety company has not complied with Rule XL of the Rules of Court of Northumberland County relative to the qualifications of surety companies to offer themselves as sureties on bonds in court proceedings.

This rule reads as follows:

"XL. SURETY COMPANIES

"1. Every application for the approval of a corporation as surety shall be accompanied by the following items concerning such corporation for the information of the Court, and upon approval of any company a statement of said items shall be filed thereafter on the third Monday of January of every year (a failure to do so ipso facto revoking such approval), viz:

"(a) A printed copy of the last report of the State Bank Examiner (or Insurance Commissioner, in case the report is made by the latter officer), relative to the corporation offered.

"(b) The amount of capital paid in, and the number of shares of stock issued and the market value thereof.

"(c) The price realized per share at the last sale of any shares of its capital stock, together with the number of shares sold and the date of said sale.

"(d) A stipulation that all moneys and securities received by the corporation from the person or persons for whom it is offered as surety, shall be kept separate and apart from other moneys and securities in an earmarked account.

"(e) The total amount for which the corporation is liable as surety.

"2. A statement of the items above referred to shall be sworn or affirmed to by the President, Secretary or agent of the corporation.

"3. No corporation will be accepted as sole security for an amount greater than half its paid-in capital stock and surplus. The Prothonotary or Clerk shall

keep a list of all companies approved, and note thereon as to each, every case, estate, matter or proceeding in which it has been accepted as surety and the amount of the bond, etc."

Counsel for respondent also contend the contestants have failed to comply with section 1 of the Act of June 29, 1923, P. L. 943, which provides that whenever any person may be required to give a bond with security conditioned for the faithful performance of any duty, in said bond specified, the judge of the court of common pleas, or any other officer who is required to approve the sufficiency of such bond, "shall approve the same whenever the conditions of such bond or undertaking are guaranteed by a company duly authorized by the Insurance Department of this State to do business in this State and authorized to guarantee the fidelity of persons holding positions of public or private trust, and whenever such company has filed, in the office of the prothonotary of the county in which the said bond is to be approved, a certificate issued by the Insurance Commissioner of the State authorizing it to become surety on all bonds, obligations, and undertakings, and until such certificate has been revoked by the Insurance Commissioner.

"Such certificate shall be conclusive proof of the solvency and credit of such company for all purposes, and of its qualifications to be so accepted as such sole surety, and its sufficiency as such."

On December 10, 1941, a photostatic copy of a certificate by the Insurance Commissioner of the Commonwealth of Pennsylvania certifying that the said Hartford Accident & Indemnity Company of Hartford, Conn., is qualified to do business in Pennsylvania was filed in the office of the Prothonotary of Northumberland County. It appears from this photostatic copy of such certificate by the Insurance Commissioner that the certificate bears date of April 1, 1941.

On December 11, 1941, by a decree of the Court of Common Pleas of Northumberland County, signed by H. W. Cummings, additional law judge of said county, the Hartford Accident & Indemnity Company was approved as a surety to execute bonds in Northumberland County.

Counsel for respondent contend that because this certificate by the Insurance Commissioner was not on file in the office of the Prothonotary of Northumberland County on December 9th, the date when the court approved said contest bond, this company was not authorized to do business in Northumberland County on that date.

We are of the opinion that, as the Pennsylvania Election Code of 1937 specifically provided that the contestants could file a surety bond at any time within five days following the date of the filing of their petition to contest the election, therefore, the filing, within the five-day period allowed for filing the bond, of a certificate issued by the Insurance Commissioner, certifying the right of said Hartford Accident & Indemnity Company to do business in Northumberland County, is sufficient. See York Ice Machinery Corp. v. Robbins et al., 323 Pa. 369, where it appeared that such a certificate was not filed for a month after the bond had been approved and placed on record and it was held the surety company was not disqualified from acting as surety on that ground alone.

The above-cited Act of June 29, 1923, has been construed by our Supreme Court in York Ice Machinery Corp. v. Robbins et al., supra, and we conclude, from a reading of the opinion in that case, that although a court may, in the exercise of its discretion and under its rules of court, approve a bond offered by a surety company that has not obtained and filed of record in the office of the prothonotary, in a particular county, a certificate to do business by the Insurance Commis-

sioner, nevertheless, it is also clearly evident from the court's opinion that, where such certificate is filed with the prothonotary of a particular county, such certificate shall be conclusive proof of the solvency and credit of such company for all purposes and of its qualifications to be so accepted as sole surety, and its sufficiency as such.

Therefore, we conclude that the Act of June 29, 1923, supra, supersedes the requirements of Rule XL of the Court of Common Pleas of Northumberland County as relates to satisfying the court as to a surety company's solvency and financial responsibility.

It is hornbook law that where the provisions of rules of court of a particular county conflict with the provisions of a statute of our State the statute shall prevail.

It was held by our Supreme Court in Equipment Corporation of America v. Primos Vanadium Co., 285 Pa. 432, that a rule of court which would require a party to do something which the legislature intended should not be required of him, or which would permit him to omit something which the legislature has required, would be in contravention of law and consequently void. That case also holds that where a mode of procedure or of practice is prescribed by statute a different requirement prescribed by rules of court is void.

In view of the construction placed on the Act of June 29, 1923, supra, in the decision in York Ice Machinery Corp. v. Robbins et al., supra, we conclude that, the Hartford Accident & Indemnity Company having complied with this statute by filing in the office of the Prothonotary of Northumberland County a certificate from the Insurance Commissioner of Pennsylvania, authorizing it to do business in our State, this is conclusive as to the solvency and financial standing of said surety company for the purpose of this bond, despite

the fact that this certificate was not filed until the day following the date the bond was approved, and that the requirements of Rule XL of the Rules of Court of Northumberland County are in conflict with the provisions of this statute, and therefore, in this instance, cannot be invoked.

Counsel for respondent further contend that the bond is not properly executed in that LeRoy M. Bissett, local agent of the Hartford Accident & Indemnity Company, had not been properly authorized to execute said bond on behalf of the bonding company due to an alleged defect in the power of attorney, also averring that there is no authorization to Wallace Stevens, vice-president of the Hartford Accident & Indemnity Company, to acknowledge, on behalf of the said company, such power of attorney authorizing LeRoy Bissett to act as its local agent.

We are of the opinion that these contentions are without merit. An inspection of the bond shows that it is recited in the power of attorney, printed therein, that it is granted under and by authority of a bylaw adopted by the board of directors of the Hartford Accident & Indemnity Company, which bylaw is also set forth verbatim, and it empowers and authorizes the executive officers of the company to execute and attest bonds and undertakings and writings obligatory in the nature thereof, as well as to appoint attorneys in fact. It further recites that the attorneys in fact shall have power and authority, subject to the terms and limitations of the power of attorney issued to them, to execute and deliver, on behalf of the company, and to attach the seal of the company thereto, any and all bonds and undertakings, and any such bonds so executed by such an attorney in fact shall be as binding upon the company as if signed by an executive officer and sealed and attested by such officer. It appears that the power of attorney to the bond in question was executed Novem-

ber 14, 1941, by Wallace Stevens, a vice-president of said company, and was attested by the assistant secretary of the company, and affixed thereto is an impression of the corporate seal. Attached to this power of attorney is a certificate by the assistant secretary of the Hartford Accident & Indemnity Company certifying that the power of attorney remains in full force and has not been revoked, and the corporate seal of the corporation is affixed to this certificate.

On the question whether such power of attorney must be recorded in the county, where bonds are issued through a local agent, we find in York Ice Machinery Corp. v. Robbins et al., supra, that there is no requirement in any of our statutes that the original power of attorney to execute bonds shall be filed of record.

Therefore, if such a power of attorney is not required to be recorded, it follows there is no need for it to be acknowledged, and the fact that the jurat affixed to the power of attorney complained of is not in the form of our Pennsylvania acknowledgments but is, rather, in the form of the jurat frequently attached to affidavits, does not render the bond invalid.

For the reasons set forth, we conclude that the surety bond is in proper form and properly executed and the Hartford Accident & Indemnity Company is lawfully certified by the Insurance Commissioner, as to its solvency and sufficiency, for the purpose of issuing the surety bond in question, and it constitutes a valid bond.

Counsel for respondent also contend that the service of the notice of the filing of this contest petition, as well as the rule to answer thereto, was not properly made on respondent, Charles K. Morganroth.

It appears from the record that the notice of the filing of this contest petition, and a copy of the petition, as well as the notice of the rule to answer said petition, was handed to respondent, Charles K. Morganroth, in person, by Ray Leffler on December 12, 1941,

and that said Leffler was a signer of the contest petition and made affidavit thereto and is one of the five petitioners who are principals in executing the contest bond. Counsel for respondent further contend that, inasmuch as Leffler was not deputized by the Sheriff of Northumberland County for any purpose whatever in connection with this case and holds no public office in the County of Northumberland, and he is a "party litigant", due to the fact that he signed the contest petition, therefore, a service by him of notice of filing the petition and rule to answer thereto was a void service.

It appears that the notice of this rule and filing of the contest petition was handed to respondent, Charles K. Morganroth, while he was temporarily absent, at the Borough of Charleroi, Pa. On the first day of the convening of this contest court, counsel for respondent admitted, in open court, that respondent was then confined to the home of a friend in Charleroi, Pa., by illness, as will be noted from the record.

Pertinent to this question of service of the notice and rule, this court takes judicial notice of the fact that respondent, Charles K. Morganroth, at the time the notice of the filing of the said petition and rule was served on him, was President Judge of the Court of Common Pleas of Northumberland County, and that his place of residence is within said county, as required during his term as judge.

Counsel for respondent further contend that the notice of the rule to answer this petition is an "original process" and therefore must be served by the Sheriff of Northumberland County or one of his deputies. In reply to this, we point out that a rule to show cause is not original process such as requires service by a sheriff, but that such notice of a rule to show cause may be served by any competent adult person. As has been said in a decision by the Superior Court, "such service is just as valid and effectual if made by a private citi-

zen, if due proof of service, by affidavit, is duly made". See Short v. Board of the School District of Upper Moreland Township, 108 Pa. Superior Ct. 503, and Carey v. Carey, 121 Pa. Superior Ct. 251.

It is not denied that an actual service was made on respondent by handing to him, in person, a notice of the filing of the contest petition, together with a copy of the petition and rule to answer thereto, while he was temporarily absent in the Borough of Charleroi, Pa., on December 12, 1941.

Counsel for respondent have not shown us any Pennsylvania authority for holding that service of such a notice and rule by a party litigant, such as one of the signers of the contest petition, thereby renders it a void service. Therefore, we are of the opinion that the service of the notice of the filing of the contest petition, as well as the copy of the rule to answer thereto, as made by one Ray Leffler personally upon respondent, by handing the same to him at Charleroi, Pa., was a valid service.

On January 7, 1942, H. F. Bonno and J. Fred Schaffer, attorneys for respondent, presented a petition and motion (made under a special appearance de bene esse and not generally) and obtained a rule upon petitioners and William I. Troutman, a party in interest, to appear and show cause why the contest petition and all proceedings thereon should not be quashed and dismissed, basing their rule upon the following reasons:

The averments in paragraph 8(a) with respect to sections 1004 and 1213 of the Pennsylvania Election Code; the averments in paragraph 8(b) with respect to section 1215(d) of the Pennsylvania Election Code, and the averments in paragraph 8(c) with respect to section 530 of the Pennsylvania Election Code; the averments in paragraph 8(d) with respect to section 417(b) of the Pennsylvania Election Code; the averments contained in paragraph 9(a) with respect to

section 1210 of the Pennsylvania Election Code; the averments contained in paragraph 9(b) relative to so-called "chain voting"; the averments contained in paragraph 9(c) with respect to section 530 of the Pennsylvania Election Code; the averments contained in paragraph 10(a) with respect to section 530 of the Pennsylvania Election Code; the averments contained in paragraphs 10 (b), 10(c), and 11 (a) with respect to section 530 of the Pennsylvania Election Code, and 11(b), 12(a), (b), (c), (d), and (e) with respect to section 530 of the Pennsylvania Election Code; and 12(f), 13(a), and 13(b), taken singly or in conjunction with any other averments in the contest petition, constitute no reason in law for throwing out the entire poll.

In paragraph 8(a) of the petition to contest, it is charged that in the first election precinct of the First Ward of the Borough of Mount Carmel no legal votes were cast for Charles K. Morganroth for the office of judge of the Court of Common Pleas of Northumberland County, for the following reasons, to wit:

That "contrary to the provisions of sections 1004 and 1213 (b) [later changed by petitioners to 1214 (b)] all of the ballots which were given to the voters in the said district were detached from the stubs by the election officer having charge of the ballots so as to leave attached to the stub the upper right-hand corner of the back of the ballot, separated from the remainder of the ballot by a diagonal perforated line so prepared that the upper right-hand corner of the back of the ballot containing the number was detached from the ballot before it was received by the voter and deposited in the box by the voter".

It does not charge that this was done by the election officer with fraudulent intent nor that the voters who received the said ballots were acting in conspiracy with the election officer nor that the ballot which each respec-

tive voter received from the election officer was not the ballot deposited by the voter.

Section 1004 of the Pennsylvania Election Code of 1937, supra, provides that "The number and initial or abbreviation which appears upon the stub shall also be printed in the upper righthand corner of the back of the ballot, separated from the remainder of the ballot by a diagonal perforated line so prepared that the upper righthand corner of the back of the ballot containing the number may be detached from the ballot before it is deposited in the ballot box."

We are of the opinion that even if the above averment is true we would not be warranted in rejecting this entire vote, thus disfranchising all the citizens who cast their ballots in that district. If the averment is true, the election officer did not perform the duty required by law, but, as pointed out before, it is not alleged that this was done fraudulently or corruptly by the election officer or that the voter had joined in a conspiracy to receive a ballot without the number and, consequently, we regard it as a mere irregularity in the absence of all allegation as to fraud, not affecting the result of the votes cast at this poll, and it has been uniformly held that irregularities will not avoid an election even though the election officers may be subject to punishment: Gollmar's Election Case, 316 Pa. 560, 565, citing West Mahanoy Township's Contested Election, 258 Pa. 176, Fish's Election, 273 Pa. 410, and other authorities, and Ayre's Contested Election, 287 Pa. 135, 137.

And in subparagraph (b) of the same paragraph, it is charged that "none of the electors of said election precinct or district, before leaving the voting compartment, exhibited his or her ballot to one of the election officers whose duty it was to ascertain, by an inspection of the number appearing upon the right hand corner of the back of the ballot, whether the ballot so exhibited to him was the same ballot which the elector received

from him before entering the voting compartment". By reason of the action of the election officers as set forth in subparagraph (*a*) (hereinbefore discussed), it was impossible to ascertain whether the ballot deposited in the ballot box by the elector was the same ballot he received before entering the voting compartment. Of course, it follows that if the number of the ballot was not attached to the ballot when handed to the voter he could not, after completing the act of voting, exhibit the number of his ballot, and since we have come to the conclusion that the receiving of the ballot without the number was a mere irregularity the exhibition of such number could not be made to an election officer and the failure to exhibit the number was also a mere irregularity.

In subparagraph (*c*) of the same paragraph, it is charged that "the polling place was not furnished with a guard-rail or barrier enclosing the inner portion of the voting room as required by section 530 of the Pennsylvania Election Code". We are of the opinion that this. is a mere irregularity. To hold otherwise would destroy the franchise of the electorate in every voting district where the commissioners of the county failed to furnish such guard-rail or barrier. It is the duty of such officers to furnish guard-rails, but their failure to perform the duty would not be ground for declaring the election held in this district void.

In subparagraph (*d*) of the same paragraph, it is charged that one "John Adzema, a watcher for Charles K. Morganroth, contrary to the provisions of section 417 (*b*) of the 'Pennsylvania Election Code', seated himself at the table with the election board and refused to leave until he was ejected by a peace officer". Section 417(*b*) of the Election Code reads:

"Only one watcher for each candidate at primaries, or for each party or political body at general, municipal or special elections, shall be allowed to remain in

the polling place at any one time prior to the close of the polls, and all watchers in the room shall remain outside the enclosed space."

We infer that, in being seated at the table with the election board, Adzema did not remain outside the enclosed space, but this was a violation of the law on the part of Adzema, if the allegation is true, and is not ground for rejecting any or all of the ballots that were deposited in the ballot box and declaring the election void.

And it is further charged in this subparagraph (*d*) of paragraph 8 that, after the closing of the poll, Adzema with others "came into the polling place in a body, crowding around the table and the ballot box", that "when the judge of election opened the ballot box and began putting the ballots on the table the said Adzema, Hynoskie, and Zdan and members of their group reached into the box and started handling the ballots, Adzema and Hynoskie having lead pencils in their hands". It does not allege that they marked any ballots with these lead pencils. It further avers that Zdan, the constable, refused to clear the room in which the vote was being counted; that he with others, put the ballots on the table and unfolded ballots and that after the board had counted about thirty ballots Hynoskie took the ballots away from the judge of election and began counting the ballots and continued so to do for more than 60 ballots; that, during that time, a large number of people, not election officers, came into the room and crowded the space around the table and ballot box; and that friends of Adzema and Hynoskie threatened anyone protesting. It then avers that Zdan, "the constable, then took a *large number* of ballots, sat on the edge of the election board table, turned his back to the judge of election and the Republican inspector of election so that the judge of election and the Republican inspector of election could not see the ballots, and then and there

*changed a large number of ballots* so as to make it appear they had voted for the said Charles K. Morganroth instead of William I. Troutman", and others of the group crowded the judge of election away from Zdan while he was calling the ballots, and that Adzema and a number of others were handling ballots, and that Adzema and Hynoskie "had and used their lead pencils most of the time". It is to be observed that, in these last averments referred to, it is not stated how many ballots the constable took, or how many ballots were changed. In Gollmar's Election Case, supra, at page 565, quoting from another case, it is reiterated in reference to a contest proceeding: "A complaint of an undue and illegal election or a false return must be stated with clearness and precision and the petitioners held to due diligence to ascertain and specify the facts which, if sustained by proof, would require the court to set aside the result of the election." The petition at bar prays for a setting aside of the result of the election in this district. The stating in the petition that it was a *large number* is not stating it with precision and, even if it were true that they could specify the number of votes that were changed by the lead pencils of the persons charged, it would not warrant us in rejecting all the votes cast in this district. If there were 10, 20, or 60 ballots changed, we could purge the list of the number changed, but we are unable to find any authority in law that would warrant a ruling that the entire election result in that district be declared void. The averment is obviously deficient in particularity (speaking of the ballots changed) and does not comply with the general rule of certainty to a common intent: Election Cases, 65 Pa. 20. While a court should not be captious in viewing petitions of the character of the one here involved, yet a complaint of an undue election or a false return must be stated with clearness and precision, and petitioners

held to the exercise of due diligence to ascertain and specify the facts which, if sustained by proof, would require the court to set aside the result of the election: Warren Borough Election, 274 Pa. 352, 353.

This subparagraph of paragraph 8 further charges that the count of the ballots and all matters connected therewith were for several hours out of the control of the election board. This averment is essentially vague and essentially general. How could the count of the ballots and all matters (whatever they were) connected with the count be out of the control of the election board? It does not appear in the petition and it, therefore, becomes more vague.

It goes on to charge that Adzema sat at the table of the election board with a pencil in his hand and that he was leafing through the ballots and that people came in and out of the election room under the influence of intoxicating liquor and that there was nothing during the entire voting period and counting of the ballots in the voting room at any time to prevent persons from circulating in the room and circulating in close proximity to the ballot box and the voting shelves or compartments, and at least three fourths of the ballots cast were handled by Adzema, Hynoskie, and Zdan and other members of their group. Even though that be true, even if these persons interfered with the counting of that vote and were intoxicated and were circulating in the room, and even if they handled the ballots, this would not justify us, because of their alleged crimes which would subject them to fine and imprisonment, in rejecting the vote in the district.

It further charges that Zdan called the ballots and passed them to Adzema when he called them, and that there was an absence of all restraint upon interference with the voter who entered the voting shelves or compartments to mark his ballot. It is to be noted that the ballots in this box, under the supervision of Judge Cummings of the Northumberland County courts, were re-

counted and that no appeal was taken from the results certified by him, and we cannot conclude that, even if these things were true, these violations on the part of the men mentioned would warrant us in rejecting the official count.

The paragraph then proceeds that John Adzema on the day before the election was engaged in the distribution of a scurrilous, libelous, and defamatory writing or printed circular, in which did not appear the names of the chairman and secretary of the party or two officers of the party or other organization issuing the same, or the name of some duly-registered elector with a description of his election district as responsible therefor, and which circular, poster, writing, and paper was untrue. How this allegation, if proved, could justify us in rejecting the count in the precinct above referred to is beyond our imagination. It is irrelevant and immaterial matter and cannot possibly warrant a rejection of the votes cast. Moreover, on motion of counsel for contestants, this section of the paragraph was withdrawn.

In paragraph 9 of the petition, it is charged that in the Lincoln district, twelfth ward, of the Township of Coal, in this county, in violation of section 1210 of the Pennsylvania Election Code, the election board did not require each elector who desired to vote first to sign a voter's certificate inserting his address therein, nor did the election officers compare the elector's signature on his voter's certificate with his signature in the district register, but, on the contrary, permitted the electors to vote without signing such certificate, and that the names of the supposed electors were signed by the election board and not by the electors. It is not charged in the petition that the signing of the voter's certificate by another, other than the voter, was done with fraudulent intent either by the voter or the election officer or that a conspiracy existed between the voter and the election officer, or that the person re-

ceiving the ballot was not entitled to vote, and we deem this to be a mere irregularity and not sufficient to warrant us in rejecting the entire vote cast in the district.

It is further charged in subparagraph (*a*) of paragraph 9 that the election board marked ballots and placed them in the ballot box for persons not attending said election and returned the names of a *large number* of such persons as having voted when, in truth and fact, such ballots were marked by unauthorized persons and not by qualified electors. The specific number or approximate number of votes thus cast is not alleged in the petition and, again citing Gollmar's Election Case, this allegation is not sufficient because it is lacking in particularity and precision. It is not alleged for whom the election board marked the ballots, whether for Morganroth or for Troutman. It was the duty of petitioners to have ascertained the names of the voters who are alleged to have voted illegally by the election board, which they could have readily discovered upon inquiry.

In subparagraph (*b*) of the same paragraph, petitioners allege that "there was *considerable so called chain voting*" in the district for the said Charles K. Morganroth. What they mean by "chain voting" does not appear and no authority defining the term has been presented, and that there was *considerable voting* is vague and lacking in particularity.

Subparagraph (*c*) of the same paragraph charges that the polling place was not furnished with a guardrail or barrier, as was charged in the Mount Carmel district, hereinbefore discussed, contrary to the provisions of. section 530 of the Pennsylvania Election Code, and that there was nothing in the voting room during the voting hours and during the counting of the ballots to prevent persons from circulating in the voting room and that all persons were permitted at all times to circulate freely and in close proximity to the ballot box and the voting compartments; and that there was an entire absence of all restraint upon inter-

ference with the voter who entered the voting shelves or compartments to mark his ballot, and "it is alleged that fraud was actually practiced in the said precinct in that many illegal and fraudulent votes were actually cast for Charles K. Morganroth for the said office of judge". We deem these allegations, omitting the conclusion of law "that fraud was practiced", to be mere irregularities and the allegations, further, are without precision or particularity and, even if stated with particularity and precision, would not warrant us in declaring the election in this district void.

Subparagraph (*a*) of paragraph 10 charges that in the Garfield district, fifth ward, Coal Township there was no guard-rail or barrier, etc., contrary to the provision of section 530 of the Pennsylvania Election Code. In subparagraph (*b*) it charges that the election board permitted interference by unauthorized persons with electors in the booths and those passing to and from the voting booths, and further permitted interference by spectators with the ballots, ballot box, and with ballots during the counting thereof. What the effect of this interference was is not stated in the petition; what acts contributed to the interference or whether the voter interfered with cast his vote for Mr. Troutman or respondent is not stated.

Subparagraph (*c*) charges that "in this polling place, the election board and other persons returned the names of a *large number* of persons as having voted who did not vote at all and signed the names of such persons to the voter's certificate". Surely it is not too much to ask the petitioner in such cases to set forth the number of persons and they could, by due diligence, within the time prescribed for a presentment of an election contest petition, designate who the persons were who were recorded as having voted who did not vote; thus the petition lacks particularity and precision, and therefore is substantially defective. As said in Goll-

mar's Election Case, supra, at page 569, ". . . it is not too much to require petitioners . . . to name those or some of those who gave or accepted illegal assistance, or to name those guilty of intimidation of voters and wherein intimidation was practiced", and we are of the opinion that it is not too much to require petitioners to name the persons fraudulently recorded as having voted who did not vote. In this paragraph it does not allege that these illegal votes inured to the benefit of Charles K. Morganroth. "The *presumption* is that the votes recorded for a candidate . . . by the return board were legal", and it is necessary that if contestant claims they were illegal then the petition must aver "that these illegal votes accrued to the benefit of respondent": Gollmar's Election Case, supra (syllabus). (Italics supplied.)

Paragraph 11, in subparagraph (*a*), charges that in the second ward, second precinct of Shamokin Borough, the polling place was not furnished with a guard-rail or barrier, contrary to the provisions of section 530 of the Pennsylvania Election Code. We have heretofore ruled that this was a mere irregularity.

In subparagraph (*b*) it charges that J. Wes Henry, a worker for Charles K. Morganroth, and at least one other person whose name is unknown, took ballots from the table into the corner of the election room, and then and there, with pencils and erasers in their hands, changed a *large number* of ballots, and the ballots so changed cannot be separated from those not changed. Again the allegation fails to set forth the number of ballots changed, or how they were changed, whether from Troutman to Morganroth or Morganroth to Troutman, and, consequently, is entirely lacking in particularity, and therefore, defective. See Warren Borough Election, supra.

It further avers that "there now appear in the ballot box of said polling place a number of ballots with an 'X' marked after the name of William I. Troutman

and then erased". It is not alleged who made the erasure; the voter may have done so. It does not aver that the ballot in which the erasure appears was made by J. Wes Henry or the unknown person. The voter himself may have made the erasure. It simply alleges a *number* of ballots without specifying whether it was 3, 10, or 50 that thus appeared.

In subparagraph (*a*) of paragraph 12, petitioners charge that in the second election precinct, Springfield district, sixth ward, Coal Township, after the closing of the polls on election night, and after the ballots had been taken from the ballot box and placed on the table, while sorting them, but before tallying any votes, the judge of election suddenly died, and that immediately upon his death there was a rush of a large number of spectators to his assistance and others coming to the table on which the ballots lay and handling of them, and that a number of said spectators picked up handfuls of ballots, carrying them to various parts of the room, and had possession of said ballots for five minutes or more. Of course, what number comprises a handful is not stated, or whether the handling of the ballots changed any of the marking thereon, or whether when being carried to various parts of the rooms they were changed, or whether the possession of the said ballots by others inured to the benefit of Judge Morganroth.

In subparagraph (*b*) of the same paragraph, it is alleged that after the ballots were handled by spectators the keys to the ballot box were taken from the pocket of the dead man and the box locked, and then the majority inspector attempted to remove the ballot box from the polling place, but was prevented from doing so, and, after reciting in detail the occurrences following, it avers that the ballot box was taken from the polling place and then returned to the polling place and that the majority inspector called out, "No Republicans allowed in here"; that this disorder and confu-

sion in said polling place was reported to Hon. H. W. Cummings, one of the judges of the Court of Common Pleas of Northumberland County, who directed the Sheriff of Northumberland County to proceed to the voting place and take possession of the ballot box and other voting material and that the order of the court was executed by the sheriff. We can see no error in Judge Cummings' order. He might have appointed a judge of election, but this would not warrant us in declaring the election held there undue and illegal.

In subparagraph (c) it charges that the ballot box was under the control of the Democratic inspector and his associates because the Republican inspector went home and that the return of election was signed as to its correctness by the judge of election and the other members of the board prior to the commencement of the counting of the ballots and prior to the death of the judge of election.

In the case of Contested Election in the First Ward of Lancaster City, 10 Lanc. 121, 122, Judge Brubaker holds:

"While we must condemn the methods of conducting this election, as to the signing of the election returns by the officers in blank during the afternoon of the election and before the closing of the polls, and as to the carrying off the ballot box and the finishing of the count of the ballots and filling in the returns the day after the election at the city hall, yet the allegations and proofs are insufficient to make out even a *prima facie* case in order to justify us to make an order to bring into court the ballot box and direct the same to be opened and a recount made."

It does not aver that the Democratic inspector and his associates changed any number of the ballots, and if it is true that they signed the returns before they had completed the count it was a violation of law for which they are answerable, but this would not warrant us in disfranchising the electors of the district.

Subparagraph (*c*) proceeds to charge that a *large number* of votes which had been cast for William I. Troutman were changed so that the same appeared for Charles K. Morganroth, but how many *comprised the large number* is not averred. It is to be noted that Judge Cummings, with a recount board, afterward counted these votes and that the accuracy of the recount is not disputed by petitioners.

Subparagraph (*d*) charges that the election board permitted the dispensing of whisky to the electors for votes for Charles K. Morganroth. What number were bribed by the whisky was not stated and it lacks particularity.

Subparagraph (*e*) charges that there was no guardrail, and as we have already declared ourselves upon this subject it is unnecessary to reiterate it.

Subparagraph (*f*) charges that, in violation of section 1218 of the Pennsylvania Election Code, "the election board permitted a *large number* of electors to receive assistance in voting in said election without there being recorded upon the elector's registration card his declaration that, because of illiteracy, he is unable to read the names on the ballot, or that he has a physical disability which renders him unable to see or mark the ballot or enter the voting compartment without assistance, and without having recorded on his registration card the exact nature of such disability, and without the election officers being satisfied that such elector still suffered from the same disability and without the elector stating distinctly and audibly under oath or affirmation the reason why he required such assistance, and the votes of said assisted electors were cast for Charles K. Morganroth". As we have before stated and by authority of Gollmar's Election Case, supra, this averment lacks particularity and, to repeat, it is defective for the reason that it should name the persons who were thus illegally assisted and the number of such persons. The remaining part of sub-

paragraph (*f*) charges that "the judge of election did not perform his duty by entering in writing in a book the voter's name; the statement of facts which entitled same to receive assistance; the name of the person furnishing the assistance, nor did the record of assisted voters, if any, returned by the judge of election to the county board of election with other papers, contain the names of all voters assisted." Of course, this dereliction of duty on the part of the judge of election would not warrant us in disfranchising the people of this district and declaring the entire election held there void.

The thirteenth paragraph, in subparagraph (*a*), charges that at Marshallton, third ward, first precinct, the polling place was not furnished with a guardrail, the effect of which failure has been disposed of in this opinion.

In subparagraph (*b*) it is charged that, "contrary to the provision of section 1218 of the Pennsylvania Election Code, the election board in said district permitted a large number of electors, at least sixty (60) to receive assistance in voting in said election from Patrick J. Brennan". This charge is the same violation as has been immediately before referred to relative to the record of assisted voters. This paragraph is the only specific and sufficient averment as to number in the entire petition. It names at least 60 voters (not identifying them, however). If this be true, it would at the most only be ground for striking 60 votes from the total votes cast for Charles K. Morganroth and this would not change the result of this election, the official count showing that Morganroth was elected by 184 votes. It would not warrant us in rejecting the entire vote cast in the district.

Paragraph 14, relating to the publication of scurrilous matter by Charles K. Morganroth relative to William I. Troutman, has been withdrawn and thus we do not consider it.

Paragraph 15, averring that Charles K. Morganroth offered to give an elector an appointment, has been withdrawn.

We are of the opinion that when the word "irregularity" is used in the decisions of the Supreme Court of Pennsylvania referring to election cases it means the failure to perform some duty or some procedural neglect in the conduct of the election which does not, however, affect the honesty of the ballot, and, also, we are of the opinion that the requirement in the Election Code that the number be attached to the ballot when given to the voter and that the voter sign a voter's certificate before voting is directory.

"It is a principle of universal application that an irregularity which does not deprive a legal voter of his vote (not accompanied with fraud by the party seeking the benefit thereof) will not vitiate the election. The omission by election officers to discharge some duty merely directory will not set aside the return . . . There are cases where the judges of election have been guilty of acts which render them liable to indictment, and yet (in the absence of fraud by the party who claimed the benefit from the result) the election was held valid. If this be so, surely the will of the people is to be given effect, in the absence of fraud, if only irregularly expressed. Negligence or mistake in the performance of duty by election officers will not be allowed to stand in the way so as to defeat the expression of the popular will": Clee's Petition, 119 N. J. L. 310, 321, 196 Atl. 476.

In the case just quoted it was held that the "duty imposed by statute on election officers in charge of an election district to compare the signature made by voter in poll book with signature of voter in permanent registered book is directory." It is also held in the same case, together with the holding of our own Supreme Court in Gollmar's Election Case, supra,

that the averments in a contest petition must be particular and specific so that respondent may be adequately and sufficiently informed to prepare his defense. In the case at bar, it would be impossible for respondent to prepare a defense to a general allegation of a *large number* of voters and therefore, with the exception hereinbefore stated relative to the 60 votes, which is referred to above and which 60 votes, even if counted for Troutman, would not change the election result, the whole petition is so defective in substance that a sufficient cause of action is not stated therein and consequently the rule to show cause why the petition should not be quashed must be sustained.

Prior to the introduction of this petition on January 7, 1942, and after the receipt by counsel for petitioners of a copy of the petition and motion to quash, the counsel for petitioners announced that they had and would file a petition for leave to amend their original petition and we will now dispose of this petition.

They propose to amend paragraph 8 of the original petition which reads: "And then and there changed a *large number* of ballots so as to make it appear they had been voted for the said Charles K. Morganroth instead of William I. Troutman"; by substituting as follows: "and then and there changed at least *seventy-five (75)* or *more* ballots so as to make it appear they had been voted for the said Charles K. Morganroth instead of William I. Troutman." In other words, their proposed amendment becomes specific by inserting the number of ballots instead of the term *"large number* of ballots".

They also propose to amend paragraph 9, subparagraph (*a*), of the original petition, which reads: "The certificates were signed by members of the election board and not by the elector. Said election board marked ballots and placed them in the ballot box for persons not attending said election and returned the

names of a *large number* of such persons as having voted when in truth and fact such ballots were marked by unauthorized persons and not by qualified electors"; by substituting the following: "All certificates were signed by members of the election board and not by the respective electors to whom ballots were issued. At least forty (40) or more electors were returned as having voted for Charles K. Morganroth who did not vote at said election, and ballots were issued to persons other than such electors who marked the same for Charles K. Morganroth for Judge of the Court of Common Pleas of Northumberland County, and such ballots were deposited in the ballot box, to the number of ten (10) or more."

Thus again the offered amendment is intended to be specific and particular.

They also offer to amend paragraph 10, subparagraph (*c*), of the original petition, which reads: "In this polling place, the election board and other persons returned the names of a large number of persons as having voted who did not vote at all and signed the names of such persons to the voter's certificate"; by substituting as follows: "In this polling place, the election board returned the names of a number of persons, to wit, thirty (30) or more, as having voted for Charles K. Morganroth, but who did not vote at all and signed the names of such persons to the voter's certificate," again offering to insert a specific number.

They also offer to amend paragraph 11, subparagraph (*b*), of the original petition, which reads: "During the voting and counting of the ballots, J. Wes Henry, a worker for the said Charles K. Morganroth, and at least one other person whose name is unknown to your petitioners, took ballots from the table into the corner of the election room and then and there with pencils and erasers in their hands, changed a large number of ballots, and the ballots so changed cannot be separated from those not changed. There now ap-

pear in the ballot box of said polling place a number of ballots with an 'X' marked after the name of William I. Troutman and then erased"; by substituting as follows: "During the counting of the ballots, J. Wes Henry and Higgins, workers for the said Charles K. Morganroth, took ballots from the table into the corner of the election room and then and there with pencils and erasers in their hands, changed a large number of ballots, and the ballots so changed cannot be separated from those not changed. Fifty (50) or more ballots were changed from William I. Troutman to Charles K. Morganroth for the office of Judge of the Court of Common Pleas of Northumberland County. There now appear in the ballot box of said polling place twelve (12) or more ballots with an 'X' marked after the name of William I. Troutman and then erased, and credited and returned by the election board for Charles K. Morganroth."

The amendment here specifies 50 or more ballots instead of just "ballots" and specifies the number 12 as appearing in the ballot box, with the addition that these 12 were credited and returned by the election board for Charles K. Morganroth, thus making this paragraph specific.

They also offer to amend paragraph 12, subparagraph (a), of the original petition, which reads: "After the closing of the poll in this election district on the evening of November 4, 1941, and after the election board had taken the ballots from the ballot box and placed them on the table and while sorting them, but before tallying any votes, the Judge of Election suddenly died. Immediately upon his death, there was a rush of a large number of spectators then and there present in the election room and of persons coming in from the outside, some of them going to the assistance of the deceased Judge of Election, and others going to the table on which the ballots lay and handling them. A number of said spectators picked up handfuls of

ballots, carrying them to various parts of the room, and had possession of said ballots for a period of five minutes or more"; by substituting as follows: "After the closing of the poll in this election district on the evening of November 4, 1941, and after the election board had taken the ballots from the ballot box and placed them on the table and while sorting them, but before tallying any votes, the Judge of Election suddenly died. Immediately upon his death, there was a rush of a large number of spectators then and there (illegally) present in the election room and of persons coming in from the outside, who went to the table on which the ballots lay and handled them without interference by the election board. A number of said persons illegally present took handfuls of ballots, carried them to various parts of the room out of sight of the election officers, and had exclusive possession of said ballots for a period of five minutes or more".

The amendment here is the insertion of the word "illegally" before the word "present" and the inclusion that there was no interference by the election board to the handling of the ballots by the spectators, and that certain spectators had exclusive possession of the ballots. This allegation fails to be specific.

They also offer to amend paragraph 12, subparagraph (b), which reads in the original petition as follows: "A violent argument as to the disposition of the ballots arose between the Election Board and the crowd in the election room. After the ballots were handled by the spectators as above set forth, they were returned to the ballot box"; by substituting the following: "A controversy as to the disposition of the ballots arose between the election board and the crowd illegally present in the election room. After the ballots had been handled by the spectators illegally present as above set forth, they were returned to the ballot box."

In this amendment, a "violent argument" is displaced for a "controversy" and there is a conclusion

of law set forth, to wit, that the spectators were "illegally present".

They propose to amend paragraph 12, second item of subparagraph (c), which in the original petition reads as follows: "Your petitioners are advised and therefore aver that during the commotion and while the ballot box was in the hands of the said Democratic Inspector of said election board and his friends, a large number of votes which had been cast for William I. Troutman for the office of Judge of the Court of Common Pleas of Northumberland County were changed so that the same appeared for Charles K. Morganroth for said office"; by substituting the following: "Your petitioners are advised and therefore aver that during the commotion and while the ballot box was in the hands of the said Democratic Inspector of said election board and his friends, a number of votes, to wit, sixty (60) or more, which had been cast for William I. Troutman for the office of Judge of the Court of Common Pleas of Northumberland County were changed so that the same appeared for Charles K. Morganroth for said office".

The change here is simply the addition of "sixty or more" votes, for the purpose of making it sufficiently specific.

They also propose to amend paragraph 12, subparagraph (f), which reads in the original petition as follows: "Contrary to the provisions of section 1218 of the 'Pennsylvania Election Code', the election board in said district permitted a large number of electors to receive assistance in voting in said election"; by substituting the following: "Contrary to the provisions of section 1218 of the 'Pennsylvania Election Code,' the election board in said district permitted a number of electors, to wit, fifty or more (50) to receive assistance in voting in said election". This amendment specifies the number of votes.

Petitioners further asked leave to amend the original petition by adding in paragraph 13 of the amended petition the averments that, in the second ward of the City of Sunbury "all of the ballots were detached from the stubs by the Election Officer having charge of the ballots so as to leave attached to the stub, the upper right hand corner of the back of the ballot, separated from the remainder of the ballot by a diagonal perforated line", and that the number on the respective ballots was not exhibited to an election officer, and that there was no guard-rail enclosing the inner portion of the voting room. This is, in substance, a repetition of the averments contained in paragraph 8 of the petition which we have held to be irregularities, and, consequently, it would avail petitioners nothing to allow them to amend in this particular.

We are of the opinion that the original petition in this case, because of its lack of particularity and precision, is substantially and legally defective. It does not state a cause of action, and it evidently appears that counsel for petitioners agree with us. Otherwise they would not have offered to make altogether eight amendments, all of which went to the substance of the action. And, if we were to allow the amendments, it would create a new cause of action. And it was held in Pazdrak's Contested Election, 288 Pa. 585, 592, that an amendment "So far as it went to the question of jurisdiction . . . could not be be filed after the expiration of the thirty days (In re Contested Election of Welti (Pa.), 3 W. N. C. 165; Williams v. Johnson (Pa.), 16 W. N. C. 223)".

Unless the original petition set forth a cause of action, we were without jurisdiction to hear and determine the matters therein set forth. The Pennsylvania Election Code of 1937 amended the former act of assembly bearing upon election contests so that it was required that the petition should be filed within

20 days. We cannot allow these amendments to be filed, and otherwise and moreover it is a matter for the lower court's discretion (Ayre's Contested Election, supra), and in exercising that discretion we are of the opinion that the amendments offered are so wide and so sweeping in certain instances that to allow them would be to allow petitioners to state a new cause of action where obviously no sufficient cause of action was pleaded in the original petition.

The Snodgrass Case, reported in 267 Pa. 494, and relied on by petitioners to sustain the right to amend the petition, does not bear out the contention made by petitioners. At page 497 of this case it is clearly implied that "omission of facts expressly required to be originally pleaded" cannot be corrected by amendment, thus supporting our ruling immediately above stated. In that case, the court allowed an amendment only as to form.

In the Contested Election of Jenkinson, 7 Dist. R. 598, Judge White says:

"In every close election it is very common to hear charges and counter-charges of fraud and illegal voting. In the majority of contested election cases the contestant has failed to establish his right to the office and considerable expense has been put upon the municipality. In every close election, where there has been a warm contest, the defeated party and his friends feel sadly disappointed, and immediately go to work to hunt up some ground for contest. Often there are positive charges of great frauds and numerous illegal votings, which are not sustained by evidence before the court. Parties, in the heat of contest, may honestly make these charges upon suspicion, hoping to obtain evidence to sustain them, but fail in the end. It is not often that election officers and voters knowingly and intentionally commit fraud. Mistakes and errors frequently occur, but they generally happen through the inexperience of election officers or from the voters or

officers not clearly understanding all the requirements of our rather complicated election laws. These laws are framed to prevent frauds. Where there was no fraud intended, but simply some technical mistake or omission, there is not much merit in the contest." (In the present petition, not one single allegation charges any election officer in any of the districts with fraud.)

"The Act of Assembly requires that the petition for a contest in a case of this kind 'shall concisely set forth the cause of complaint, showing wherein it is complained the election is undue or illegal'. It is not sufficient to set forth in general terms, however positive, numerous frauds and illegal voting. It must set forth specifically the frauds and illegal votes, and show that these frauds and illegal votes elected the party returned and defeated the contestant. For that purpose it is necessary to state for whom these voters voted. The petition of complaint, or the papers connected with it, must give the names of the alleged illegal voters and the grounds of illegality, so that the respondent may know what he is called upon to meet."

These observations are peculiarly applicable to the case at bar and the offers to amend are refused.

In Fish's Election, supra, at page 417, it is said:

"Moreover, to eliminate an entire poll, though no harm has actually been done, merely because public officials did not perform their duty properly, would result in the very wrong sought to be prevented; for if they are unscrupulous (knowing, as they always do, where votes antagonistic to their desires will be cast), they can wrongly fit up the election room and booths in every district which they desire shall be thrown out, and thus indefinitely control elections, even for their successors, pledged in advance to repeat the wrong."

We feel it to be our duty, in closing this opinion, to make the suggestion that, if the violations of law charged against the election officers and others, as contained in the contest petition, are true, criminal prose-

cution of the alleged offenders becomes the duty of the public officers and the citizenry of Northumberland County, but we would not be justified, because of these alleged crimes of others, to strike down in effect the democratic institution of election by the people and thus disfranchise the honest voters in any district.

It must be remembered that in every paragraph of the petition the prayer of petitioners is that we declare void the entire election in the district complained of, and it is not prayed for, in any paragraph, that only the illegal votes be purged.

And now, February 21, 1942, the motion of respondent to strike off the bond is overruled; the motion of respondent to strike off the service is overruled; the rule to show cause .why the petition should not be quashed is made absolute and the petition is quashed; and the motion to amend the original petition of contest is refused. The petition is hereby dismissed at the cost of the petitioners.

NOTE.—No appeal was taken from the foregoing opinion and order.